#24109, #24125-rev & rem-DG

**2008 SD 86**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DIANE MOUSSEAU,                                           Plaintiff and Appellant,

v.

STEVEN SCHWARTZ, M.D., AND,
STEVEN SCHWARTZ, M.D., P.C., d/b/a
WEST RIVER NEUROSURGERY & SPINE,          Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE A. PETER FULLER
Judge

\* \* \* \*

MICHAEL C. LOOS of
Clayborne, Loos, Strommen
  & Gusinsky, LLP
Rapid City, South Dakota                    Attorneys for plaintiff
                                             and appellant.


LONNIE R. BRAUN
TIMOTHY L. THOMAS of
Thomas Nooney Braun
Solay & Bernard, LLP
Rapid City, South Dakota                    Attorneys for defendants
                                             and appellees.

\* \* \* \*

ARGUED ON MARCH 26, 2008

OPINION FILED **08/20/08**

#24109, #24125

GILBERTSON, Chief Justice

[¶1.]       On November 15, 2002, Diane Mousseau (Mousseau) filed suit against

Steven B. Schwartz, M.D., and Steven B. Schwartz, M.D., P.C., d/b/a West River

Neurosurgery & Spine (collectively Dr. Schwartz) alleging medical malpractice.

The case was tried to a jury on February 12-15, 2006, in the South Dakota Seventh

Judicial Circuit.  The jury entered a verdict for Dr. Schwartz and on February 21,

2006, the trial court entered judgment on the verdict.  We reverse and remand.

## FACTS AND PROCEDURE

[¶2.]       On June 5, 2001, Mousseau consulted with Dr. Schwartz, a Rapid City,

South Dakota, neurosurgeon, about a problem she was having with pain in her back

and lower extremities.  Dr. Schwartz at that time was new to the practice of

neurosurgery in Rapid City having only commenced his practice in June 2000,

shortly after he was issued his license to practice medicine.  Dr. Schwartz conducted

an examination and diagnosed Mousseau with the following condition, as he

testified to at trial:

I found that there was a severe degree of spinal stenosis[1]

---

1.    *Stenosis* is a condition that describes a narrowing or closing of an anatomical
      space.  http://www.cure-back-pain.org/foraminal-stenosis.html (last visited
      August 13, 2008).
      *Spinal stenosis* refers to the condition where, due to degeneration of, or wear
      and tear on a part of the spinal column, the spinal canal becomes narrower
      putting pressure on the nerves in the canal thereby causing pain in the
      extremities.
      http://www.eorthopod.com/public/patient_education/6571/lumbar_laminectom
      y.html (last visited August 13, 2008).

at the L3-4[2] level with associated neuro foraminal stenosis,[3]that being the tunnel the nerve roots traveled through.  I found there was a moderate to severe degree of spinal stenosis at the next level down, which was L4-5, also, with foraminal stenosis, and I found some foraminal stenosis on the left at the lowest segment, the L5-S1 level and along with that a grade one spondylolisthesis at the L5-S1 level which was a slight slippage of the L5 vertebral body forward on the sacrum.

Based on his diagnosis, Dr. Schwartz testified that he made the following recommendation to Mousseau:

[B]ased on the severity of her pain, the duration of her symptoms, the severe limitation that she had with her walking and standing and the generalized discomfort that she had because of this, that the treatment would be my recommendation which could consist of opening up those compressed areas and that was the laminectomy[4] that I recommended, which was an L3-L4 and L5

---

2. There are three main groups of vertebrae – the cervical vertebrae atop the spinal column, of which there are seven; the thoracic vertebrae, situated below the cervical vertebrae, of which there are twelve; and the lumbar vertebrae situated below the thoracic vertebrae, of which there are five.  The letters "C," "T," and "L" are used respectively to designate cervical, thoracic and lumbar vertebrae.  The sacrum is located at the base of the spinal column and below it, the coccyx or "tailbone."  The five sacral and four coccygeal vertebrae are fused and together are considered one bone.  http://www.apparelyzed.com/spine.html (last visited August 13, 2008).

3. *Foraminal stenosis* is a spinal condition occurring when a *foramen*, or opening between vertebrae through which a nerve root exits the spinal column, narrows.  The condition can result in compression of the spinal nerve root causing pain and discomfort in the extremities.  http://www.ortho-spine.com/content/spine/eidelson0124_2003.html (last visited August 13, 2008).

4. *Laminectomy* is a procedure used to treat spinal stenosis.  See *supra* n1 regarding *spinal stenosis.*  During the procedure, the spinous process (the bony projection on the posterior side of the vertebra) and the lamina on each side are removed from the affected area, thereby alleviating pressure in the spinal canal.  http://www.eorthopod.com/public/patient_education/6571/lumbar_laminectomy.html (last visited August 13, 2008).

laminectomy with foramintomies[5] which is opening up the tunnels that the nerve roots ran through. . . .

Dr. Schwartz conducted the procedure on Mousseau the following day.

[¶3.] After experiencing some initial relief, Mousseau began having renewed pain in her back and lower extremities within two months of the surgery. On October 10, 2001, she underwent another examination. During the trial, Dr. Schwartz testified that he diagnosed her condition at that time as follows:

> The findings noted . . . that there was evidence of a Retrolisthesis[6] of the L3 on L4 which appeared to increase from the flexion to the extension view by several millimeters. In addition, there was loss of the disk space height at this level with concomitant . . . neuro foraminal stenosis. I noted that there was a slight spondylolisthesis, grade one, of L5 on S1 which appeared to be stable and did not move from flexion to extension and I gave my impression and that was instability demonstrated at the L3-4 level with disk space collapse.

---

5. *Foraminotomy* is a procedure performed to enlarge the *foramen*, or opening between vertebrae through which a nerve root exits the spinal column, in order to alleviate pain caused by pressure on the spinal nerve root. During the procedure, the surgeon removes the bone or tissue which obstructs the passageway and causes pressure. This information was obtained at http://www.spineuniverse.com/displayarticle.php/article554.html (last visited August 13, 2008).

6. *Retrolisthesis* is the posterior displacement of one vertebra on the subjacent vertebra. http://www.medcyclopaedia.com/library/topics/ volume_iii_1/r/retrolisthesis.aspx (last visited August 13, 2008).

On November 1, 2001, Dr. Schwartz performed a second surgery on Mousseau. He described the procedure as "an L3-4 redo, diskectomy[7] with posterior lumbar intrabody fusion[8] at L3-L4, L3-L4, pedicle screw fusion[9] and [postero-] lateral autograft fusion."[10]

[¶4.]     Mousseau, who testified that she continued to suffer back pain as well as pain and weakness in the lower extremities following the second surgery, filed a malpractice suit against Dr. Schwartz on November 15, 2002. At the February 12-15, 2006 trial, Mousseau presented evidence through the expert testimony of a

---

7.    *Diskectomy* or "[d]iscectomy is the surgical removal of herniated disc material that presses on a nerve root or the spinal cord." http://www.webmd.com/back-pain/discectomy-or-microdiscectomy-for-a-herniated-disc (last visited August 13, 2008).

8.    "Posterior lumbar interbody fusion surgery involves adding bone graft to an area of the spine to set up a biological response that causes the bone to grow between . . . vertebral elements[,] thereby stop[ping] motion at that segment." http://www.spine-health.com/treatment/back-surgery/posterior-lumbar-interbody-fusion-plif-surgery (last visited August 13, 2008).

9.    "[P]edicle screw[s, which are] sometimes used as an adjunct to spinal fusion surgery, provide[ ] a means of gripping a spinal segment. The screws themselves do not fixate the spinal segment, but act as firm anchor points that can then be connected with a rod." http://www.spine-health.com/treatment/spinal-fusion/pedicle-screws-for-spine-fusion (last visited August 13, 2008).

10.   "A Postero-lateral spinal fusion is achieved through an incision in the middle of the back by joining adjacent vertebrae with screws and rods but without interfering with the disc. Small pieces of bone are usually taken from the back of the pelvis, through the same skin incision, and are placed along the back and side of the vertebrae to be fused." http://www.spine.com.au/spinal_fusion.htm#Postero-lateral%20Fusion: (last visited August 13, 2008). The term "autograft" is in reference to the taking of bone tissue from one part of the patient's body and placing it at another. http://www.medterms.com/script/main/art.asp?articlekey=40486 (last visited August 13, 2008).

Rapid City neurosurgeon, Dr. Larry Teuber, that Dr. Schwartz had failed to deliver the applicable standard of care in three ways.

[¶5.]     First, Dr. Teuber testified that Dr. Schwartz failed to decompress spinal nerves in the L5-S1 vertebral segment, thereby leaving a stenosis condition in that location at the conclusion of the initial surgery on June 6, 2001.  Second, Dr. Teuber stated that the November 1, 2001 fusion surgery was necessary *because of* the procedures that Dr. Schwartz performed on Mousseau on June 6.  Dr. Teuber testified that the laminectomy performed at the L3-L4 vertebral segment on June 6, actually weakened the spine in that location with the predictable result that the L3 vertebra slid back in relation to the L4 vertebra resulting in a "clinically significant retrolisthesis" at that segment.  Dr. Teuber further indicated that a complete diagnosis prior to surgery would have taken into account the need for fusion in addition to laminectomy at the L3-L4 segment.  Dr. Teuber stated that this should have been discussed with Mousseau prior to the June 6 surgery and that she should have been advised that if the fusion was not performed during the initial surgery, it would have to be undertaken later.

[¶6.]     Finally, Dr. Teuber testified that Dr. Schwartz breached the applicable standard of care when he excessively retracted Mousseau's spinal nerve roots during the November 1, 2001 fusion surgery, thereby causing nerve damage.  Dr. Teuber stated that excessive manipulation of the nerve roots during the fusion surgery resulted from the increased difficulty in performing the procedure due to the growth of scar tissue around the affected nerves subsequent to the June 6 surgery.  Dr. Teuber indicated that the nerve retraction injury was the avoidable

result of not performing the L3-L4 fusion coincident with laminectomy on June 6, 2001, and thus, constituted a breach of the standard of care.

[¶7.] In a pretrial motion to exclude evidence of other malpractice claims against Dr. Schwartz, defense counsel acknowledged that Dr. Schwartz was the subject of "numerous claims" alleging malpractice. Two suits, filed by Bobbi Gay and Sharon Sowards,[11] were specifically addressed in Mousseau's response to defense counsel's pretrial motion and at a pretrial motions hearing.[12] Subsequent to the initiation of Mousseau's suit against Dr. Schwartz, the South Dakota State Board of Medical and Osteopathic Examiners (the "Board") brought disciplinary proceedings against him to address allegations of malpractice. On December 17, 2003, three and one half years after Dr. Schwartz commenced his practice and two and one half years after his first surgery on Mousseau, the Board entered its "Stipulation On Agreed Disposition And Order Of Probation" (the Stipulation) in regard to the licensure of Dr. Schwartz. Therein, his license was placed on probationary status. As a condition of the probation, Dr. Schwartz was required to complete one year of "advanced clinical training" in neurosurgery and a minimum of three months in neuroradiology. His practice of medicine was restricted to only

---

11. Pretrial documents indicate that Dr. Schwartz performed vertebral fusion surgery at the incorrect level on Bobbi Gay and removed a healthy vertebra instead of the intended adjacent fractured vertebra from Sharon Sowards.

12. "By Dr. Schwartz's own estimate, there have been over thirty suits alleging medical malpractice filed against him. However, some of those have been dismissed, three others have been tried to defense verdicts, and at least nine remain to be tried." Kostel v. Schwartz, 2008 SD 85, ¶21 n15, __ NW2d __, __ n15.

that required to fulfill his training requirement. Further conditions of his probation provided that for a period of five years, following the successful completion of his training, Dr. Schwartz was prohibited from solo practice, thereby limiting himself to a neurological group practice setting. The Stipulation also stated:

> This Agreement for the disposition of the above entitled contested case is a mater of *public record* and the obligations of the Board with respect thereto shall be governed by the laws of South Dakota and current Board policy.

(Emphasis added). Moreover, the Stipulation provided that "the Board will report its disciplinary action to the National Practitioner Data Bank, the Healthcare Integrity and Protection Data Bank, and the Federation of State Medical Boards." The Board therein stated that the reason given for Dr. Schwartz's license probation was "Malpractice."

[¶8.] Prior to trial, Dr. Schwartz filed a motion to exclude the Stipulation evincing his licensure probation and the conditions thereon. Mousseau sought to admit the Stipulation as evidence that Dr. Schwartz lacked the necessary knowledge, skill and training to provide the applicable standard of care. Moreover, Mousseau sought to use the Stipulation to impeach Dr. Schwartz's testimony. The trial court granted Dr. Schwartz's motion and excluded the Stipulation.

[¶9.] The jury returned a verdict for Dr. Schwartz and Mousseau raises the following issue on appeal:

> Whether the trial court abused its discretion by excluding the Board's order of probation and agreed stipulation, including sanctions and conditions imposed therein.

## STANDARD OF REVIEW

[¶10.]    "The trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion. 'An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'"  Kaiser v. Univ. Physicians Clinic, 2006 SD 95, ¶29, 724 NW2d 186, 194 (internal citations omitted).

## ANALYSIS AND DECISION

[¶11.]    **Whether the trial court abused its discretion by excluding the Board's order of probation and agreed stipulation, including sanctions and conditions imposed therein.**

[¶12.]    Mousseau asserts that the trial court's decision to exclude the Stipulation and evidence about the status of Dr. Schwartz's licensure and conditions placed thereon constituted prejudicial error.  Mousseau argues that, had she been able to use the Stipulation in her case-in-chief or to cross-examine Dr. Schwartz, the outcome of the trial would have likely been different.  *See* Kjerstad v. Ravellette Publications, Inc., 517 NW2d 419, 427 (SD 1994) (opining that the prejudicial impact of evidentiary error is amplified when the evidence in question goes to the "vital issue" in a case).  We will address the bases for Mousseau's assertion of error separately.

*Admissibility of the Stipulation as Evidence of the Degree of Knowledge and Skill Possessed by Dr. Schwartz*

[¶13.]    The trial court delivered Instruction No. 6 to the jury as follows:

> In performing professional services for a patient, a neurosurgeon has the *duty to possess* that degree of knowledge and skill ordinarily possessed by neurosurgeons

>of good standing engaged in the same field of specialization in the United States.
>
>A neurosurgeon also has the *duty to use* that care and skill ordinarily exercised under similar circumstances by neurosurgeons in good standing engaged in the same field of specialization in the United States and to be diligent in an effort to accomplish the purpose for which the neurosurgeon is employed.
>
>A failure to perform *any such duty* is negligence.

(Emphasis added). Mousseau contends that this instruction and our settled case law establishes two separate duties for the practitioner engaged in the performance of professional services – a duty to *possess* the degree of knowledge and skill ordinarily possessed by practitioners in the profession *and* a duty to *use* that knowledge and skill in the manner ordinarily used by practitioners in the profession under like circumstances. Mousseau avers that a breach of either duty is then negligence *per se* because it constitutes a failure to meet the applicable standard of care. Consequently, she argues that the trial court abused its discretion by excluding the Stipulation and the provisions therein pertaining to Dr. Schwartz's licensure probation and the conditions thereupon. Mousseau argues such evidence was relevant to the consideration of whether Dr. Schwartz failed to meet the applicable standard of care by breaching a duty to *possess* the requisite degree of knowledge and skill.

[¶14.] Dr. Schwartz submits that our settled case law does not establish two separate grounds upon which the practitioner can be found liable for negligence. He contends that the practitioner is negligent only if he *deviates from* the applicable standard of care and such only occurs if he should fail to *have and use* the skill and

care ordinarily employed by practitioners in the profession under like circumstances. Thus, he reasons, since the degree of knowledge and skill possessed by the practitioner *does not alone* constitute a basis upon which a jury can find a failure to meet the applicable standard of care, the trial court correctly excluded the Stipulation since it would not have established the causation required to sustain a negligence action for medical malpractice.

[¶15.]     In this regard, Dr. Schwartz cites *Martinmaas v. Engelmann*, 2000 SD 85, ¶31, 612 NW2d 600, 608 (holding that the defendant physician *deviated* from the applicable standard of care when he "breached his *duty to* 'use that care and skill ordinarily exercised under similar circumstances by physicians in good standing'" and that such deviation constituted malpractice) (emphasis added); *Shamburger v. Behrens* (*Shamburger II*), 418 NW2d 299, 305 (SD 1988) (citing a jury instruction similar to Instruction No. 6 that, however, concluded with the statement, "The failure to perform *these duties* is negligence") (emphasis added); *In re Appeal of Schramm*, 414 NW2d 31, 34 (SD 1987) (concluding in reference to a jury instruction similar to Instruction No. 6 that the issue becomes "whether the professional *deviated* from *this* required standard of care") (emphasis added) (citation omitted); *Block v. McVay*, 80 SD 469, 476, 126 NW2d 808, 811 (1964) (affirming a judgment for defendant physician where there was no evidence to support a finding "that he failed to *apply* his skill and judgment with ordinary care") (emphasis added), *overruled on other grounds by* Shamburger v. Behrens (*Shamburger I*), 380 NW2d 659 (SD 1986); *Hansen v. Isaak*, 70 SD 529, 531, 19 NW2d 521, 522 (1945) (recognizing that while the law requires a physician to *have*

the degree of learning and skill ordinarily possessed by practitioners in the profession, negligence consists of the physician's "failure to conform to a standard of care" defined therein as "the obligation to *have and to use* the skill and care" commonly *possessed* by members of the profession) (emphasis added).

[¶16.]    While we are not persuaded by Mousseau that a practitioner fails to meet an applicable standard of care simply by failing to possess the knowledge and skill ordinarily possessed by practitioners in the field, neither are we persuaded by Dr. Schwartz that the Stipulation was properly excluded simply because a breach of his duty to possess ordinary knowledge and skill *did not alone* constitute a failure to meet the applicable standard of care and establish the causal connection to Mousseau's injury.

[¶17.]    As Dr. Schwartz points out, this Court has previously stated:

> The law requires that a physician shall *have* the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same community and negligence of a doctor consists of his failure to conform to the standard of care which the law establishes for members of his profession, that is, the obligation *to have and to use* the skill and care which members of his profession commonly possess and exercise under similar circumstances. Warwick v. Bliss, 46 SD 622, 195 NW 501 [(1923)].

*Hansen*, 19 NW2d at 522 (emphasis added). While we no longer subscribe to that portion of the statement that refers to a local standard of care, *see Shamburger II*, 418 NW2d at 306 (adopting a national standard of care by which the practitioner shall be measured), *Hansen* does in essence reflect the content of Instruction No. 6 from the instant case. The question before us is to what extent, if any, consideration of the degree of "learning and skill" *possessed* by the physician enters

into the determination of malpractice. This Court's opinion in *Fjerstad v. Knutson*, 271 NW2d 8 (SD 1978), *overruled on other grounds by Shamburger I*, 380 NW2d at 663, together with our review of opinions from other jurisdictions is instructive.

[¶18.]      In *Fjerstad*, the plaintiff sued the defendant medical intern for malpractice contending that he was negligent *per se* because he practiced medicine without a license. *Id.* at 13. In rejecting the plaintiff's broad contention, the Court recognized that while patients are entitled to an applicable standard of care notwithstanding the caregivers' status as an intern, the patient's interest must be balanced with the medical licensure requirement that a fully licensed physician must first accredit himself through the institution of the intern requirement. *Id.* at 13-14. However, the Court signaled a broader application for its holding that practicing medicine without a license is not evidence *per se* of negligence, stating:

> *Aside from the intern requirement*, we do not believe that failure to have a license should, *in itself*, render the unlicensed person negligent. A physician is negligent if his treatment is improper, but *failure to have a license is not enough to render the treatment automatically deficient*.

*Id.* at 14 (citing Tittle v. Hurlbutt, 497 P2d 1354 (Hawaii 1972); Janssen v. Mulder, 205 NW 159 (Mich 1925)).

[¶19.]      *Tittle* was another case involving a plaintiff who asserted that a physician was negligent *per se* by practicing medicine without a license. *Tittle*, 497 P2d at 1355. Although, the physician was highly experienced having practiced medicine for eighteen years in two jurisdictions, including a medical administration position with the United States Navy, he did not have a license because he had not yet lived in Hawaii long enough to satisfy that state's residency requirement, which

was in existence at the time the act giving rise to the claim arose. *Id*. at 1356. The Hawaii Supreme Court rejected the plaintiff's assertion stating that "it would have been absurd to measure his skill by his non-licensed status." *Id*. at 1356. *See also Janssen*, 205 NW at 161 (holding that a failure to comply with the state registration requirement "*is not in itself* sufficient on which to base a charge of malpractice") (emphasis added).

[¶20.] In *Hall v. Hilbun*, 466 So2d 856, 860-66 (Miss 1985), *superseded by statute on other grounds*, the plaintiff in a medical malpractice action challenged the manner in which the defendant physician conducted postoperative care of the decedent. The court reiterated the applicable law that a physician "has a duty of care consistent with the level of expertise the physician *holds himself out as possessing* and consistent with the circumstances of the case." *Id*. at 869 (emphasis added). The court then stated:

> Liability results from the physician's failure to provide requisite care under the circumstances, and nothing turns on whether this failure resulted from *incompetence or neglect*.
>
> Our law has long focused upon the quality of care a physician's knowledge and skill may enable him to render. . . . [A] physician must *possess* that reasonable degree of learning, skill and experience which is ordinarily possessed by others in his profession.

*Id*. (emphasis added).

[¶21.] In *Durham v. Vinson*, 602 SE2d 760 (SC 2004), the South Carolina Supreme Court considered an appeal by a defendant physician in a medical malpractice suit. The defendant asserted that a jury instruction, similar to Instruction No. 6, *supra* ¶13, was erroneous in that it should not have included a

"knowledge component." *See id.* at 765. The defendant argued that emphasis on his education and training combined with the instruction implied to the jury that the defendant could be found liable for malpractice "*solely on the basis of a lack of education or background*[.]" *Id.* (emphasis added). The court agreed with the defendant to the extent that the instruction suggested that a lack of professional learning, "*by itself*," constituted a breach of the standard of care. *Id.* (emphasis added). However, while holding that in the case at bar any such implication was harmless, the court went on to state that "[t]he standard of care in a medical malpractice action concerns *both* the physician's skill and the physician's professional learning." *Id.* at 765-66 (emphasis original). The court further developed this view as follows:

> Professional learning is pertinent to a physician's background and training, particularly when the procedure in question . . . requires a special kind of learning. Therefore, the knowledge component was properly included in the jury charge. But the lack of or inadequacy of such knowledge *is not, by itself*, dispositive as to whether a physician is liable for medical malpractice.

*Id.* at 766 (emphasis added).

[¶22.] We read the pertinent sections of these opinions together to mean that a deficit in the degree of knowledge and skill possessed by a practitioner from that ordinarily possessed by other practitioners in the field *is not alone sufficient* for the fact finder to conclude that the applicable standard of care has not been met. However, *that deficit is relevant to that determination* in that it goes to the question of whether the practitioner had and used the skill and care which other practitioners in the field commonly possess and use. *See supra* ¶17 (quoting

-14-

*Hansen*, 19 NW2d at 522); *see also* Kostel v. Schwartz, 2008 SD 85, ¶59, __ NW2d __, __ (holding that language in a jury instruction stating that a "result alone is not, in itself, evidence of negligence" was not to be interpreted to mean that the nature of the result is *no* evidence of negligence, but rather could be considered along with other evidence in making that determination). This is intuitive in that one who does not possess ordinary knowledge and skill cannot apply either in the course of conducting a procedure.

[¶23.]     Dr. Schwartz held himself out as a licensed practitioner in the field of medicine specializing in neurosurgery. Unlike the usual medical malpractice case, which merely questions the otherwise competent physician's application of a standard of care, here, Mousseau asserted that Dr. Schwartz failed to even possess the degree of knowledge and skill ordinarily possessed by neurosurgeons. Accordingly, Dr. Schwartz should be held to possess the degree of knowledge and skill ordinarily commensurate with such credentials. We conclude that Mousseau should have been able to introduce the Stipulation on this basis, because it was relevant to the jury's determination of whether Dr. Schwartz possessed ordinary knowledge and skill and whether he had and used the skill and care ordinarily possessed and used by other neurosurgeons under like circumstances.[13]

---

13.    Since neither Mousseau nor Dr. Schwartz have alleged that Instruction No. 6 was erroneous, we do not address that issue on this appeal. However, we caution that such an instruction may be misinterpreted such that an inference could be drawn that a practitioner might fail to meet an applicable standard of care either by failing to possess *or* use the ordinary knowledge and skill possessed and used by practitioners in the field.

[¶24.]     Alternatively, Dr. Schwartz argues that to admit the Stipulation would violate SDCL 19-12-5 (Rule 404(b))[14] in that it would serve to establish an inference for the jury that when Dr. Schwartz operated on Mousseau he was negligent in conformity with prior acts.  In *Kostel*, we summarized the analysis that must proceed before "other acts" evidence can be properly admitted under Rule 404(b) as follows:

> Given that the list of "other purposes" under Rule 404(b) for which evidence of other acts may be admitted is nonexclusive, the possible uses, other than character is limitless.  Rule 404(b) is thus an inclusionary rule, not an exclusionary rule.  Evidence is *only* inadmissible under the rule if offered to prove character.

2008 SD 85, ¶27, __ NW2d __, __ (citations omitted) (emphasis original).

[¶25.]     In this case, Mousseau has not argued for inclusion of the Stipulation as evidence of Dr. Schwartz's character or to show that he acted in conformity with some prior act.  As we have already set out in the foregoing analysis, Mousseau sought to introduce the Stipulation as evidence of Dr. Schwartz's deficiency in knowledge and skill and that such deficiency was relevant to his ability to meet the applicable standard of care that required him to have and to use the skill and care

---

14.     Rule 404(b) codified under SDCL 19-12-5 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.  It may, however, be admissible for other purposes, *such as* proof of motive, opportunity, intent, preparation, plan, *knowledge*, identity, or absence of mistake or accident.

(Emphasis added).

of that ordinarily possessed and used by neurosurgeons under similar circumstances. While the Stipulation is certainly prejudicial to Dr. Schwartz, he has failed to show that it is unfairly so or that the prejudicial nature of the Stipulation outweighs its probative value. Therefore, his alternative argument also fails.

*Admissibility of the Stipulation to Cross-Examine Dr. Schwartz*

[¶26.]     The trial court allowed Dr. Schwartz to testify as a "fact" witness without inquiry into the Stipulation and his licensure probation on the condition that Dr. Schwartz refrain from offering any opinion as to the applicable standard of care. Mousseau avers that notwithstanding this demarcation between "fact" and "expert" testimony, Dr. Schwartz effectively appeared as an expert witness by virtue of the highly technical nature of his testimony about how he arrived at his diagnosis of Mousseau's condition and his recommendations to her, as well as the manner in which he described the procedures he performed on her. Simply stated she asserts that, in the eyes of the jury, Dr. Schwartz was providing technical, expert testimony, regardless of whether he specifically stated any opinions regarding the standard of care. *See Block*, 126 NW2d at 812 (holding that "[l]aymen cannot be expected to possess the technical knowledge and experience required to intelligently second guess a physician on diagnostic procedures and the conclusions to be drawn therefrom; this is especially true in a case such as this where the [ ] *nervous system*[ ] of the human body [is] involved") (emphasis added). Mousseau, therefore, argues that Dr. Schwartz should have been available for cross-examination about the Stipulation and the nature of his conditional licensure that

was in effect at the time of trial, as it went to his knowledge, skill, learning, and training in the field of neurosurgery and thus the credibility of his testimony. *See* State v. Litschewski, 1999 SD 30, ¶¶22, 23, 590 NW2d 889, 903 (recognizing that where a witness makes an issue of his credibility by favorable direct testimony, he "'opens the door' to impeachment evidence on cross-examination") (citations omitted).

[¶27.]    The excerpts of Dr. Schwartz's testimony are replete with explanations of his diagnostic findings prior to both the June 6 and November 1, 2001 surgeries and how they supported his conclusions about recommended courses of treatment for Mousseau's condition preceding the respective surgeries.[15]  Dr. Schwartz offered

---

15.    In addition to the diagnostic and recommendation testimony in regard to the June 6, 2001 surgery, cited *supra* ¶2, Dr. Schwartz also offered the following direct testimony at trial concerning his preoperative assessments and the procedure itself:

Dr. Schwartz:    *[G]iven the symptoms, given the excellent clinical correlation that I felt existed, I felt there was an explanation for her pain* [ ] *that fit* [ ] *the symptoms very well* and given the treatment options, one of which . . . was injection therapy, however, I told Ms. Mousseau that epidural steroid injections . . . in a diabetic doesn't fix the problem because this is a mechanical problem with compression by bone, the overgrown facet joints, that's the body component of this compression and thickened ligament. There's a . . . ligament just underneath the facet joints called the ligament flavum or yellow ligament, [ ] that was the majority of the compression and that while steroids might in an unpredictable manner help . . . they might be like applying a Band-Aid[.] It was not a fix and *given the severity of*

(continued . . .)

_____

(. . . continued)

*the symptoms and the radiographic findings, I felt that she was at a point where she needed surgical treatment*, and I made that recommendation. . . .

Defense Counsel: [C]an you tell the jury how you would have described [to Mousseau] the surgical procedure you were performing[?]

Dr. Schwartz: I told Ms. Mousseau that with the spinal narrowing that the bones at the back of the spine, which look like a shingle, one on the left, one on the right, with a pointy spinous process in between the two and that being the bone that you can feel when you press on your back, that that was the portion that we remove to open the canal. I told her that I would do it at the third, the fourth, and the fifth lumbar levels, and I, also explained to her that each level of the spine where the, [ ] nerve roots come out at each segment or level, that the nerves run through little tunnels, called a neuroforamina and that I would decompress those nerves where they ran through the tunnels. I discussed the risks of the surgery which there's always a risk of bleeding, although I felt that that was a minimal risk. *With her being diabetic, the risk of infection was discussed, and that was although with diabetics there is a high risk of infection, I generally would tell patients and . . . I told Ms. Mousseau that the risk of infection was probably about 1 in 100, still extremely low. I told her that we give prophylactic antibiotics, that's before the surgery and then several doses of antibiotic after the surgery. I reassured her that the risk of bleeding was small and I would not expect to have to transfuse her. So as I routine, I wouldn't get a blood consent for a transfusion with this type of surgery because I would explain that the only circumstances where*

(continued . . .)

-19-

(. . . continued)

*blood might be needed would be in some unforeseen complication which was extremely rare* and that typically was not even needed, that we lost very little blood with this type of surgery. I told Ms. Mousseau that whenever I worked around in there and saw the sac containing the nerves, there was a little risk of injury to those structures, although that was extremely small and that I didn't expect that there would be any problem from a nerve injury, any weakness or paralysis. I also explained that working around the nerves and [ ] the dural [sic] which is the covering around the nerves and the sack containing the nerves and contained in addition to the nerves, the spinal fluid. That there's always a risk of spinal fluid leak. *[I]f that tears, . . . spinal fluid would leak out, typically it would be seen at the time of surgery, and fixed* and [ ] *what I would do is I would just sew it up.* I told her that there would be in rare cases, it's not obvious that a spinal fluid leak has occurred, and that after the surgery, *[if] there was clear fluid draining through the incision, . . . that would be an indication that there was a spinal fluid leak and the worst case scenario that we might have to take her back to fix that. . . . I did explain to Ms. Mousseau that in the majority of cases, after you do a decompression, that nine times out of ten, no further problems develop. . . .* **However, in approximately ten percent of patients, instability might develop. If that happens it would require a fusion, however, the chances of that happening are so low that there's really no indication to do a fusion up front**, **besides the fact that she had minimal low back pain at the time that she saw me, which once again was another indication to me . . . that there really wasn't a component of instability present**.

(continued . . .)

-20-

_____

(. . . continued)

. . .

Defense Counsel: Okay. Could you describe for the jury, Doctor, what you did in performing the surgery?

Dr. Schwartz: . . . The lumbar region was pricked in a sterile fashion, an incision was made, the levels were identified, the bones were exposed, removed, and then foraminotomies were carried out. After doing that, the sac containing the nerve roots was inspected by looking at it and the nerve roots themselves were individually palpated or felt with the surgical probe to make sure that the probe could be passed along each of the nerve roots on either side from L3 down to the S1 nerve root. ***And that's the way that I would ensure that the decompression was adequate***, *and once it was done, I would stop the bleeding,* I stopped the bleeding, irrigated with saline and peroxide which is *something I did routinely*. The peroxide really to help kill bacteria possibly as well just as kind of an [ ] extra little thing that I routinely do, and then was sutured in a multi-layered fashion, meaning several layers initially I, I would sew up and the muscle and fascia, which is the thick connective tissue just overlying the muscle and then the subcutaneous tissue, and finally the skin. A dressing was applied[.] Ms Mousseau [ ] was placed back on the stretcher. She was extubated by the anesthesiologist, woken up and taken to recovery.

(Emphasis added).

Dr. Schwartz offered the following direct testimony in regard to his October 10, 2001 examination of Mousseau, his diagnostic conclusions and his recommendations leading up to the November 1, 2001 fusion surgery:

(continued . . .)

_____

(. . . continued)

Defense Counsel: . . . Could you relate what your chart reflects your review of the x-ray was on October 10, 2001, of the flexion/extension films?

Dr. Schwartz: *. . . The findings I noted was . . . that there was evidence of a retrolisthesis of L3 on L4* which appeared to increase from flexion to the extension view by several millimeters. In addition, there was loss of the disk space height at this level, . . . with associated neuron foraminal stenosis. I noted that there was a slight spondyloisthesis, grade one, of L5 on S1 which appeared to be stable and did not move from flexion to extension and *I gave my impression and that was instability demonstrated at the L3-4 level with disk space collapse.*

. . .

Defense Counsel: Following your review of the MRI's and the x-rays, Doctor, what did you do?

Dr. Schwartz: Well, given the findings on the flexion/ extension films, I took these and I felt that those were significant. *My impression was that there was instability. Ms. Mousseau had related developing back pain and left anterior thigh discomfort.* **This indicated to me that there was potential instability just based on the description of this mechanical back pain**, . . . which was evidenced on these lateral flexion/extension films and in addition to that, the foraminal stenosis that *I note on the x-rays would correlate with an L3 nerve root compression syndrome which would fit to me and along with her description of this left anterior thigh pain. So to me, this was the most significant study, because it did indicate a problem radiographically to my interpretation that went along with her clinical symptoms* and

(continued . . .)

_____

(. . . continued)

> I discussed these x-rays with . . . Ms. Mousseau[ ] and made a recommendation to her based on this.

(Emphasis added).

Dr. Schwartz offered the following testimony on cross-examination:

Plaintiff's Counsel:     You did not discuss with Ms. Mousseau on June 5, 2001, the option of fusing one or more of her vertebrae to fix her problem, correct?

Dr. Schwartz:            Given Ms. Mousseau's complaints –

Plaintiff's Counsel:     That's a yes or no?

Dr. Schwartz:            I'm trying to answer your question. *Given Ms. Mousseau's complaints of mild low back pain and predominant left leg pain, I didn't believe that a fusion operation at this time was even indicated.*

                         . . .

                         I believe at this time, *I felt that a conservative surgical approach would be the most appropriate for Ms. Mousseau given her symptoms, her findings and her radiographic studies.*

Plaintiff's Counsel:     You don't know, you didn't have a flexion/ extension films prior to consenting Ms. Mousseau for the laminectomy and foraminotomy, did you?

Dr. Schwartz:            Ms. Mousseau had mild low back pain. I saw no reason to get flexion/extension films.

                         . . .

                         I think one can get an x-ray anytime,

                                        (continued . . .)

-23-

testimony as to percentage rate for various types of complications that could potentially arise during or as a result of the procedures he proposed. He also testified to the practice that he and others would follow during the various stages of the procedure that he performed on Mousseau and what he would do if complications arose. Most significantly, however, when Dr. Schwartz testified in regard to the probability that vertebral instability might develop as a result of the June 6, 2001 surgery by stating that "the chances of that happening are so low that there's really no indication to do a fusion up front," he directly contradicted the expert testimony of Dr. Teuber. One of the ways Dr. Teuber testified that Dr. Schwartz had failed to meet the applicable standard of care was that he should have recognized that the laminectomy performed at the L3-L4 vertebral segment actually weakened the spine in that location resulting in a "clinically significant retrolisthesis," *see supra* n6, at that segment necessitating the fusion surgery at that segment performed on November 1, 2001. *See supra* ¶3.

[¶28.] While in the view of the trial court, Dr. Schwartz's testimony constituted that of a percipient "fact" witness, conveying only his observations of his examinations of and surgeries performed on Mousseau and refraining from

---

(. . . continued)

but ***as a clinician, I think it's incumbent to use judgment and you get an x-ray if you feel that the clinical signs and symptoms warrant getting an x-ray or whatever other study the clinician wants to order***.

(Emphasis added).

testifying to an applicable standard of care, it is apparent that his testimony amounted to an expert medical opinion offered by a witness with highly specialized knowledge in a field beyond the scope of a layman's independent comprehension. *See* State v. Fool Bull, 2008 SD 11, ¶29, 745 NW2d 380, 389 (concluding that an emergency room physician called by the State as a percipient observer in regard to her examination of a rape victim offered testimony that amounted to expert opinion); *see also* Orth v. Stoebner & Permann Const., Inc., 2006 SD 99, ¶44, 724 NW2d 586, 596 (reiterating in a case where we found that a physician stated with a satisfactory degree of medical probability that a work-related injury and degenerative condition respectively accounted for fifty percent each for the plaintiff's condition that "[t]here are no 'magic words' needed to express an expert's degree of medical certainty, and the test is only whether the expert's words demonstrate that he or she was expressing an expert medical opinion") (quoting Stormo v. Strong, 469 NW2d 816, 824 (SD 1991)); Ward v. Epting, 351 SE2d 867, 872 (SC 1986) (holding that the defendant physician, who took the witness stand as a mere party and not an expert, did effectively offer expert testimony based in part on the fact that she testified to routine surgical and recovery room procedures in addition to her own actions and to a reasonable degree of medical certainty as to how the subject event in the case at bar occurred).

[¶29.]     Moreover, while Dr. Schwartz did not expressly offer testimony as to his opinion on the applicable standard of care, we conclude that he in effect did so. From Dr. Schwartz's testimony as to the practice that he and others would follow during the various stages of the procedures that he performed on Mousseau, we can

infer that he was testifying to an applicable standard of care. To conclude otherwise would be to surmise that Dr. Schwartz disavows the application of a standard of care or at best is ambivalent about such a standard. *See* McCurdy v. Hatfield, 183 P2d 269, 271 (Cal 1947) (holding that while the defendant physician did not expressly testify to an applicable standard of care, his testimony did amount to what constituted proper practice, and thus, could reasonably be inferred to constitute testimony as to a standard of care ordinarily applied by physicians under like circumstances); Huffman v. Lindquist (*Huffman I*), 213 P2d 106, 110 (CalDistCtApp 1950), *vacated on other grounds by* Huffman v. Lindquist (*Huffman II*), 234 P2d 34 (Cal 1951); Dickow v. Cookinham, 266 P2d 63, 65-66 (CalDistCtApp 1954); *see also Huffman II*, 234 P2d at 41 (reasoning that where a defendant physician, who does not expressly testify to an applicable standard of care, but does in effect testify to a proper practice, it is presumed that the practice is based on the applicable standard of care and if the defendant physician does not therewith conform, a *prima facie* case of negligence is therein established).

[¶30.]         Still, Dr. Schwartz argues that, in any case, the trial court properly excluded the Stipulation evincing his licensure probation and the conditions thereon. He cites *Boomsma v. Dakota, Minnesota & Eastern R.R. Corp.*, 2002 SD 106, 651 NW2d 238, *overruled on other grounds by* State v. Martin, 2004 SD 82, 683 NW2d 399; *Sommers v. Friedman*, 493 NW2d 393 (WisCtApp 1992); *Soto v. Lapeer County*, 426 NW2d 409 (MichCtApp 1988); and *King v. Ahrens*, 16 F3d 265 (8thCir 1994) for the proposition that under the circumstances of the instant case, evidence

pertaining to the status of professional licensure is not a proper subject of cross-examination. However, these cases are distinguishable from the case on appeal.

[¶31.]    In *Boomsma*, the trial court refused to admit evidence that plaintiff's expert had voluntarily relinquished his optometry license and defendant appealed. 2002 SD 106, ¶48, 651 NW2d at 248. Unlike the instant case where Dr. Schwartz acknowledged by way of the Stipulation that his licensure probation was attributable to malpractice, in *Boomsma*, the plaintiff's expert was merely the subject of *allegations* of misconduct. This case lends no support to Dr. Schwartz's position. Our affirmance of the trial court in *Boomsma* was based on the court's reasoning that in lieu of any evidence of misconduct, allowing testimony "which amounted to no more than mere allegations of misconduct" "would be more prejudicial than probative." *Id*. ¶51

[¶32.]    In *Sommers*, the plaintiff sought to cross-examine the defendant physician about the fact that she had failed two *voluntary* internal medicine specialty board certification exams three years and four years respectively prior to examining the decedent. 493 NW2d at 397. The plaintiff asserted that the exam failures were relevant to the defendant's overall competency and that they were the proper subject of impeachment because she alleged the defendant offered expert opinions on the subject matter underlying the exams. In refusing the plaintiff's request, the trial court reasoned that the defendant offered only very limited opinion testimony and that the exam failures were of limited relevance to the manner in which she examined the decedent. *Id*. at 397-98. Contrasted with *Sommers*, in the instant case, Dr. Schwartz offered a voluminous amount of medical

opinion testimony in regard to the diagnosis and treatment of Mousseau. And, the licensure probation and conditions set out in the Stipulation were relevant to the level of credibility that the jury might assign to Dr. Schwartz's seemingly competent testimony.

[¶33.]    In *Soto*, the trial court ruled that the plaintiff could not question the defendant physician about a consent order whereby he agreed to a probationary period during which his license was restricted. 426 NW2d at 411-12. In affirming the trial court, the appellate court noted that the consent order arose out of an administrative complaint filed against the defendant concerning a specific procedure performed on a particular patient, that it did not arise out of the case at bar, and that it did not involve any procedure performed by the defendant in the case at bar. *Id*. at 412. The nature of the Stipulation in the instant case is dissimilar in that although it may have arisen out of Dr. Schwartz's malpractice in regard to other patients, the procedures giving rise to his stipulated conditional licensure were neurosurgical spine procedures.

[¶34.]    Finally in *King*, that trial court refused to allow evidence that the defendant physician's medical license had been suspended for thirty days some eight years prior to trial. 16 F3d at 268. *King* is inapposite to Dr. Schwartz's five-year conditional licensure probation that began twenty-six months prior to trial. With reference to the balancing test applied under Rule 403,[16] the Eighth Circuit Court of Appeals stated:

---

16.    Rule 403 codified under SDCL 19-12-3 provides as follows:

(continued . . .)

> The danger of unfair prejudice is substantial and immediately apparent in this case for several reasons. The license suspension by its very nature reflects badly on [the defendant's] professional conduct, although this alone does not amount to *unfair* prejudice. Additional factors to weigh include the remoteness of the license suspension to the incident at issue, the suspension having occurred approximately eight years before [the defendant's] examination of Mr. King. The license suspension did not arise out of the same or similar circumstances as the incident at issue. Further, the veracity of [the defendant] and his medical chart were subject to thorough impeachment at trial by inconsistencies readily apparent in his testimony, the medical chart, and his deposition, and the past license suspension would have shed little new light on [the defendant's] character for truthfulness. Thus, in spite of the peripheral relevance of the suspension, there was great danger that the jury might improperly infer from the fact of a distant and unrelated past license suspension that [the defendant's] professional judgment and conduct in the instant case must have been substandard solely because his license had been suspended on a prior occasion. Given the danger that this evidence might influence a jury to decide the case on an improper basis and the great deference with which we review this evidentiary ruling, we cannot say that the district court abused its discretion in determining that the danger of prejudice outweighed the probative value of the license suspension.

*Id*. at 269-70 (emphasis in original).

[¶35.] In the instant case, both Dr. Schwartz and Mousseau thoroughly briefed the issue of whether to allow reference to the Stipulation, and fully argued factors for and against admission during a pretrial motions hearing. The trial court

---

(. . . continued)

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

appears to have ruled in favor of exclusion without balancing the probative value against the danger of unfair prejudice or providing any justification on the record.

[¶36.]    Our review of the record reveals no basis similar to that cited by the court in *King*, 16 F3d at 269-70, as to why the Stipulation should not be admitted into evidence or available for Mousseau to use during cross-examination of Dr. Schwartz.  The Stipulation was relevant to the degree of knowledge and skill in the field of neurosurgery possessed by Dr. Schwartz during the time proximate with the procedures he performed on Mousseau.  Accordingly, it was relevant to his credibility as a witness who effectively gave expert testimony in the field of neurosurgery.  While evidence of, or inquiry into, Dr. Schwartz's licensure probation and conditions thereon would no doubt have been prejudicial to him, the probative value of that evidence outweighs the prejudicial effect upon Dr. Schwartz in the context of his having had the chance to offer highly technical, effectively expert testimony to the jury without any challenge to the credibility of his supposedly competent testimony.

[¶37.]    Alternatively, Dr. Schwartz argues that to admit the Stipulation would violate SDCL 19-14-10 (Rule 608(b)), because he argues the probationary status of his license is not probative of his reputation for truthfulness.  Rule 608(b), codified under SDCL 19-14-10 provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in §§ 19-14-12 to 19-14-16, inclusive, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness:

>     (1) Concerning his character for truthfulness or
> untruthfulness; or
>     (2) Concerning the character for truthfulness or
> untruthfulness of another witness as to which
> character the witness being cross-examined has
> testified.

[¶38.]     We addressed this precise issue when presented to the Court for review by Dr. Schwartz in *Kostel*, 2008 SD 85, ¶13, __ NW2d __, __. Thus we need not revisit our analysis of the proper scope of application for Rule 608(b), other than to reiterate our holding:

> [W]hile inquiry into an expert's *alleged* mistakes or
> connection to *unrelated* adverse claims do not impact on
> his credibility or character for truthfulness, evidence
> contrary to the representation of the witness's expertise
> in the field for which he offers his opinion at bar *is relevant
> to his competency*, does impact credibility and therefore
> is appropriate inquiry.

*Id.* ¶14 (emphasis original) (citations omitted).[17] Furthermore, in *Kostel*, we restated our prior recognition that when a witness places his credibility at issue

---

17.     As we did in *Kostel*, we again note Dr. Schwartz's citation to *Hathcock v. Wood*, 815 So2d 502 (Ala 2001) in support of his position that inquiry into the Stipulation and his conditional licensure probation violates Rule 608(b). *See* 2008 SD 85, ¶14 n9, __ NW2d __, __ n9. In *Kostel*, we explained:

> In *Hathcock*, a medical malpractice case, the Alabama Supreme
> Court deferred to the trial court's conclusion that cross-
> examination of plaintiff's expert about events that led to his
> medical license being placed on probationary status by the local
> licensing authority was more prejudicial than probative. 815 So2d
> at 507. However, affirming the trial court, the Alabama court
> opined that "evidence bearing on a witness's veracity is forbidden
> under Rule 608(b)." *Id.* at 508. We are not persuaded by this
> interpretation of Alabama's rule, which is identical to South
> Dakota's, for this is precisely the kind of testimonial evidence that
> a party may elicit on cross-examination pursuant to the express
> language in the rule.

through favorable direct testimony, he "'opens the door'" to impeachment on cross-examination pursuant to SDCL 19-14-8 (Rule 607),[18] even in instances when evidence is not otherwise admissible under Rule 608(b). *Id.* ¶20 (citing *Litschewski*, 1999 SD 30, ¶¶22, 23, 590 NW2d at 903 (quoting State v. Byrum, 399 NW2d 334, 337-38 (SD 1987)) (citations omitted).

[¶39.]     Finally, Dr. Schwartz argues that inclusion of the Stipulation would violate the provisions of SDCL 36-4-31.5,[19] which establishes as confidential, witness testimony and documentary evidence in license cancellation, revocation, suspension, or limitation proceedings conducted by the Board. However, our review of the Stipulation reveals that it does not include any information from the Board proceeding itself, which is the focus of the confidentiality statute. Therefore, the

---

18.     Rule 607 codified under SDCL 19-14-8 provides:

> The credibility of a witness may be attacked by any party, including the party calling him.

19.     SDCL 36-4-31.5 provides:

> Testimony of a witness or documentary evidence of any kind on cancellation, revocation, suspension, or limitation proceedings are not subject to discovery or disclosure under chapter 15-6 or any other provision of law, and are not admissible as evidence in any action of any kind in any court or arbitration forum, except as hereinafter provided. No person in attendance at any hearing of the Board of Medical and Osteopathic Examiners considering cancellation, revocation, suspension, or limitation of a license issued by it may be required to testify as to what transpired at such meeting. The prohibition relating to discovery of evidence does not apply to deny a physician access to or use of information upon which a decision regarding his staff privileges was based. The prohibition relating to discovery of evidence does not apply to any person or his counsel in the defense of an action against his access to the materials covered under this section.

provisions of SDCL 36-4-31.5 are not invoked by inclusion of the terms and conditions of Dr. Schwartz's probation as provided in the Stipulation. Moreover, since Dr. Schwartz consented that the terms of the Stipulation constituted a public record, *see supra* ¶7, his claim that SDCL 36-4-31.5 precludes admission of the Stipulation is without merit.

[¶40.]     Dr. Schwartz established his neurosurgery practice in June 2000, immediately after completing his residency. One year later, he performed the first of two procedures on Mousseau. Mousseau alleges that during the first procedure on June 6, 2001, Dr. Schwartz failed to meet the applicable standard of care by leaving untreated, areas of her spine that needed treatment, while at the same time weakening others, thereby necessitating spinal fusion surgery on November 1, 2001. She further alleges that the accumulation of scar tissue following the first surgery led to Dr. Schwartz again failing to meet the applicable standard of care by damaging nerve roots while conducting the second surgery, resulting in permanent back pain and leg weakness. During the time proximate with Mousseau's surgery, Dr. Schwartz conducted procedures on other patients from which claims of malpractice were raised. Ultimately, Dr. Schwartz entered into the Stipulation with the Board whereby his license was placed on probationary status with numerous conditions precedent to his full reinstatement, including retraining in his chosen field and group practice for five years thereafter. The reason given by the Board for the sanctions was "Malpractice."

[¶41.]     The Stipulation was evidence of a deficiency in Dr. Schwartz's knowledge and skill in the field of neurosurgery that related directly to his ability to

meet the applicable standard of care by possessing and using the skill and care ordinarily possessed and used by neurosurgeons under like circumstances. In addition, the Stipulation was relevant to challenge the credibility of Dr. Schwartz's highly technical, effectively expert testimony regarding his diagnostic findings and conclusions and the manner in which he conducted the surgery on Mousseau. Finally, as a public record, there was no basis in this case for the exclusion of the Stipulation. Accordingly, we conclude that the trial court abused its discretion by excluding the Stipulation. Because the terms and conditions therein went to vital matters in the case – the level of knowledge and skill possessed by Dr. Schwartz and the credibility of his testimony – exclusion of the Stipulation in all probability affected the outcome of the jury's verdict and thereby constitutes prejudicial error. *See* Carpenter v. City of Belle Fourche, 2000 SD 55, ¶23, 609 NW2d 751, 761; *Kjerstad*, 517 NW2d at 427.

[¶42.] Reverse and remand for further proceedings consistent with the foregoing opinion.

[¶43.] ZINTER and MEIERHENRY, Justices, and WILBUR and HOFFMAN, Circuit Judges, concur.

[¶44.] WILBUR, Circuit Judge, sitting for SABERS, Justice, disqualified.

[¶45.] HOFFMAN, Circuit Judge, sitting for KONENKAMP, Justice, disqualified.