#24244, #24254-a-DG

**2008 SD 85**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PATRICIA KOSTEL,                                    Plaintiff and Appellee,

v.

STEVEN B. SCHWARTZ, M.D., individually,
STEVEN B. SCHWARTZ, M.D., P.C., d/b/a
WEST RIVER NEUROSURGERY & SPINE,
a professional corporation,                          Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE A. PETER FULLER
Judge
* * * *

G. VERNE GOODSELL
TERENCE R. QUINN
MATTHEW E. NAASZ of
Gunderson, Palmer, Goodsell & Nelson, LLP
Rapid City, South Dakota                             Attorneys for plaintiff
                                                     and appellee.


LONNIE R. BRAUN
TIMOTHY L. THOMAS
GREGORY J. BERNARD of
Thomas Nooney Braun
Solay & Bernard, LLP
Rapid City, South Dakota                             Attorneys for defendants
                                                     and appellants.

* * * *

ARGUED ON MARCH 26, 2008

OPINION FILED **08/20/08**

#24244, #24254

GILBERTSON, Chief Justice

[¶1.]        Patricia Kostel (Kostel) filed suit against Dr. Steven B. Schwartz, M.D. and Steven B. Schwartz, M.D., P.C., d/b/a West River Neurosurgery & Spine (collectively Dr. Schwartz) alleging medical malpractice.  The case was tried to a jury May 30 through June 8, 2006, in the South Dakota Seventh Judicial Circuit. The jury entered a verdict for Kostel and on June 27, 2006, the trial court entered a judgment on the verdict.  We affirm.

## FACTS AND PROCEDURE

[¶2.]        In March 2002, Kostel consulted with Dr. Schwartz, a Rapid City, South Dakota, neurosurgeon, in regard to a back problem.  Following an examination of Kostel and review of her medical records, Dr. Schwartz recommended that she undergo a one-level spinal fusion at the L4-L5[1] vertebral segment.  The procedure was to involve an L4 laminectomy[2] and L4-L5 discectomy[3]

---

1.     There are three main groups of vertebrae – the cervical vertebrae atop the spinal column, of which there are seven; the thoracic vertebrae, situated below the cervical vertebrae, of which there are twelve; and the lumbar vertebrae situated below the thoracic vertebrae, of which there are five.  The letters "C," "T," and "L" are used respectively to designate cervical, thoracic and lumbar vertebrae.  The sacrum is located at the base of the spinal column, and below it, the coccyx or "tailbone."  The five sacral and four coccygeal vertebrae are fused and together are considered one bone. http://apparelyzed.com/spine.html  (last visited August 8, 2008).

2.     Laminectomy is a procedure used to treat *spinal stenosis* – a condition that causes pain in the extremities due to compression of the spinal nerves inside the spinal canal, arising from degeneration, or wear and tear, in the parts of the spine adjacent to the affected area.  During the procedure, the spinous process (the bony projection on the posterior side of the vertebra) and the lamina on each side are removed from the affected area, thereby alleviating the pressure.

                                                              (continued . . .)

using posterior lumbar interbody fusion[4] with pedicle screws.[5]  Dr. Schwartz operated on Kostel on March 8, 2002.  In addition to the anticipated fusion at the L4-L5 segment, Dr. Schwartz performed fusions at the L3-L4 and L5-S1[6] segments as well.

[¶3.]     Following her surgery, Kostel received an anonymous letter, ostensibly written by a surgical nurse or operating room or scrub technician, which alleged that serious problems had occurred during the surgery.[7]  The letter suggested that

_____

(. . . continued)
http://www.eorthopod.com/public/patient_education/6571/lumbar_laminectomy.html (last visited August 8, 2008).

3.     "Discectomy is the surgical removal of herniated disc material that presses on a nerve root or the spinal cord."  http://www.webmd.com/ back-pain/discectomy-or-microdiscectomy-for-a-herniated-disc (last visited August 8, 2008).

4.     "Posterior lumbar interbody fusion surgery involves adding bone graft to an area of the spine to set up a biological response that causes the bone to grow between . . . vertebral elements[,] thereby stop[ping] motion at that segment."  http://www.spine-health.com/treatment/back-surgery/surgery-overview/lumbar-surgery/posterior-lumbar-interbody-fusion-plif-surgery.html (last visited August 8, 2008).

5.     "[P]edicle screw[s, which are] sometimes used as an adjunct to spinal fusion surgery, provide[ ]a means of gripping a spinal segment.  The screws themselves do not fixate the spinal segment, but act as firm anchor points that can then be connected with a rod."  http://www. spine-health.com/treatment/spinal-fusion/pedicle-screws- spine-fusion (last visited August 8, 2008).

6.     This designation refers to the segment that includes the last lumbar vertebra and the first sacral vertebra.  http://images.main.uab.edu/ spinalcord/graphicimages/bspine.gif (last visited August 8, 2008).

7.     The anonymous letter had been written by Larry Teuber, M.D., a competing Rapid City neurosurgeon.

Kostel seek legal recourse against Dr. Schwartz and included referrals and Yellow Page advertisements for local attorneys practicing in the field of medical malpractice. Kostel ultimately filed suit against Dr. Schwartz alleging negligence in the performance of her surgery, and that the surgery exceeded the scope of the L4-L5 fusion to which she had given consent.

[¶4.]        During the jury trial the parties disputed why the surgery went beyond its preoperative scope. Kostel alleged that Dr. Schwartz became "lost in her spine" and mistakenly performed unnecessary fusions in addition to the consented-to, L4-L5 fusion. Kostel elicited testimony from Dr. Schwartz that in the fourteen months prior to her surgery, he had misread X-rays and had conducted surgery at unconsented-to levels. Her suit against Dr. Schwartz, supported by expert testimony, was founded on the claim that such was the case with her procedure and that he had consequently breached the standard of care to which she was entitled.

[¶5.]        Dr. Schwartz testified that the preoperative examination and X-rays did not reveal problems in the L3-L4 and L5-S1 segments. He stated that it was only after the operation had commenced that the problems in these segments were apparent, and that accordingly, he fused those areas as well. Dr. Schwartz presented expert witnesses who testified that a procedure conducted beyond the scope of consent, to repair spinal problems undetectable through preoperative examination, was consistent with the requisite standard of care.

[¶6.]        The jury found for Kostel and awarded damages of $551,962.96. Kostel moved for additur, or in the alternative, a new trial on damages. Dr. Schwartz responded and moved for a new trial. The trial court denied the post-trial motions and entered judgment on the verdict on June 27, 2006.

[¶7.]     Both parties allege error in regard to evidentiary decisions and jury instructions by the trial court. Dr. Schwartz raises six issues on appeal:

1.    Whether the trial court abused its discretion when it precluded Dr. Schwartz from testifying to his training, experience and knowledge without opening the door to the disclosure of other allegations of malpractice and associated disciplinary proceedings.

2.    Whether the trial court abused its discretion when it allowed Kostel to elicit testimony from Dr. Schwartz pertaining to alleged "other acts" and when the court gave the jury an instruction limiting the applicability of the testimonial evidence obtained during this line of questioning.

3.    Whether the trial court abused its discretion when it refused to admit an anonymous letter sent to Kostel, the author of which was a competitor of Dr. Schwartz's and non-testifying expert for Kostel.

4.    Whether the trial court abused its discretion by the inclusion of jury instructions objected to by Dr. Schwartz and the denial of others that he requested.

5.    Whether the trial court abused its discretion by the *sua sponte* preclusion of evidence related to Kostel's history of psychiatric disorders.

6.    Whether the trial court erred when it excluded evidence that portions of Kostel's medical bills were "written off" pursuant to federal laws governing the billing of Medicare beneficiaries.

We address one issue raised by Kostel on notice of review:[8]

7.    Whether the trial court abused its discretion by denying Kostel's request for a jury determination of her claim for punitive damages.

---

8.    Due to our affirmance on Issues 1 through 6, we need not address Kostel's remaining issues.

## ANALYSIS AND DECISION

[¶8.]     1.     **Whether the trial court abused its discretion when it precluded Dr. Schwartz from testifying to his training, experience and knowledge without opening the door to the disclosure of other allegations of malpractice and associated disciplinary proceedings.**

[¶9.]     Within the fourteen-month period prior to the surgery he performed on Kostel, Dr. Schwartz operated on two patients, on both of which Dr. Schwartz mistakenly performed procedures in the wrong locations on the patients' spines. The first of these surgeries took place in July 2001, seven months after Dr. Schwartz completed his residency and started his practice. As a consequence, litigation arising from these two incidents was pending at the time the instant case was at trial.

[¶10.]     On December 17, 2003, Dr. Schwartz signed a stipulation with the South Dakota State Board of Medical and Osteopathic Examiners (the "Board") wherein he agreed to have his license placed on probationary status. Among the conditions of the probation, Dr. Schwartz agreed to complete one year of advanced clinical training in neurosurgery and three months of advanced training in neuroradiology. He also agreed that he would limit his practice of medicine to the extent required to fulfill the training obligations. Dr. Schwartz further agreed that for a period of five years following the completion of training, he would refrain from practicing on his own and that during that time he would only engage in the practice of neurosurgery through group practice. The stipulation provided that various national data bases and the Federation of State Medical Boards would be

notified of the probation and that the "Basis for Action" given in such notification would be "Malpractice."

[¶11.]     Dr. Schwartz moved in limine to exclude evidence or testimony concerning the other pending malpractice suits and Board proceedings. At a hearing on May 5, 2006, the trial court granted his motion. The exclusion was conditioned, however, on Dr. Schwartz refraining from offering any testimony about his training and experience, or opinions as to the applicable standard of care. Still, Dr. Schwartz was permitted to testify about the surgical procedure he performed on Kostel and the intra-operative pathology that he alleged was the basis for expanding the preoperative scope of the surgery without exposing himself to examination of other pending malpractice claims or proceedings involving the same type of allegations. Nevertheless, Dr. Schwartz contends the ruling was prejudicial and that he should have been able to offer his expert opinion as to the applicable standard of care and to establish for the jury the basis for his opinion by testifying to his training and qualifications without being subject to inquiry into the other pending malpractice suits or the Board proceedings.

[¶12.]     "The trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion. 'An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.'" Kaiser v. Univ. Physicians Clinic, 2006 SD 95, ¶29, 724 NW2d 186, 194 (internal citations and quotations omitted).

[¶13.]     Dr. Schwartz argues that an inquiry into the other pending malpractice suites or Board proceedings would violate SDCL 19-14-10 (Rule 608(b)). Rule 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in §§ 19-14-12 to 19-14-16, inclusive, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness:
>
> > (1) Concerning his character for truthfulness or untruthfulness; or
> > (2) Concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

In support of this argument, Dr. Schwartz cites *Persichini v. William Beaumont Hosp.*, 607 NW2d 100 (MichCtApp 1999); *Heshelman v. Lombardi*, 454 NW2d 603 (MichCtApp 1990); *Nowatske v. Osterloh*, 549 NW2d 256 (WisCtApp 1996); and *Roe v. Doe*, 612 NYS2d 558 (NYSupCt 1994).

[¶14.]    These cases are consistent with the precept that inquiry into an expert's *alleged* mistakes or connection to *unrelated* adverse claims do not impact on his credibility or character for truthfulness. However, these cases also hold that evidence contrary to the representation of the witness's expertise in the field for which he offers his opinion at bar *is relevant to his competency* and does impact credibility, and therefore, is appropriate inquiry.[9]  *See Persichini*, 607 NW2d at 106

---

9.    Dr. Schwartz also cites *Hathcock v. Wood*, 815 So2d 502 (Ala 2001) in support of his position that inquiry into the other malpractice suits and Board proceedings would violate Rule 608(b). In *Hathcock*, a medical malpractice case, the Alabama Supreme Court deferred to the trial court's conclusion that cross-examination of plaintiff's expert about events that led to his medical license being placed on probationary status by the local licensing authority was more prejudicial than probative. *Id*. at 507. However, affirming the trial court, the Alabama court opined that "evidence bearing on a witness's veracity is forbidden under Rule 608(b)." *Id*. at 508. We are not persuaded

(continued . . .)

(holding that inquiry on cross-examination of expert as to whether he had been a defendant in other malpractice cases without addressing any alleged misdiagnosis in said cases, was not relevant to the expert's competency or knowledge); *Heshelman*, 454 NW2d at 609 (holding that "[m]ere unproven accusations of malpractice stated in a complaint cannot be used as a basis for attacking a physician's knowledge and credibility"); *Nowatske*, 549 NW2d at 259 (holding that cross-examination of expert about the mere existence of malpractice actions against him did not impact on his credibility and did not go to his character for truthfulness or untruthfulness); *Roe*, 612 NYS2d at 560 (holding that disclosure of defendant expert's conviction of a criminal offense was relevant to his credibility as a witness, but that inquiry into the disciplinary proceedings that resulted in the suspension of his license due to the well publicized criminal conviction did not aid the fact finder in assessing his credibility and competency in regard to the unrelated malpractice suit at bar).

[¶15.]     In *Wischmeyer v. Schanz*, 536 NW2d 760 (Mich 1995), the Michigan Supreme Court analyzed this issue in a case with facts that closely parallel those of the instant case.  The plaintiff in *Wischmeyer* injured his back and thereafter consulted with the defendant physician who performed an "L4-L5 discectomy with a posterior lumbar interbody fusion (PLIF)."  *Id*. at 762.  The plaintiff filed a malpractice suit when his condition worsened following the surgery.  *Id*. at 763.

---

(. . . continued)
    by that court's interpretation of this rule, which is identical to South
    Dakota's, for this is precisely the kind of testimonial evidence that a party
    may elicit on cross-examination pursuant to the rule's express language.

Plaintiff's expert testified at length to his credentials and explained that he performed six to ten PLIF surgeries and "hundreds of other spinal surgeries." *Id.* Plaintiff's expert offered a colloquy on various spinal surgery procedures and how they should be performed, culminating with his conclusion that the defendant performed the wrong procedure on the plaintiff, and further, that he had performed that procedure incorrectly. *Id.* The expert then pronounced that the "plaintiff's symptoms 'should not have occurred unless there was some negligence at the time of the procedure.'" *Id.*

[¶16.]     On cross-examination, Schanz's defense counsel inquired into plaintiff's expert's success in the six to ten PLIF surgeries he had performed that were similar to the one at issue in that case. Plaintiff's expert acknowledged that none of these procedures had been successful. He was also asked about four non-PLIF surgeries that had failed, which plaintiff's expert denied remembering. Plaintiff's expert then testified he had never been a defendant in a medical malpractice suit. *Id.* at 763.

[¶17.]     On appeal, that court considered defense counsel's cross-examination in a two-part analysis – the question of whether plaintiff's expert had been the subject of a malpractice suit and the inquiry into plaintiff's expert's failed *non*-PLIF procedures.[10] In regard to the malpractice inquiry, the court held that "the mere fact that an expert may have been named in an *unrelated* medical malpractice action is not probative of his truthfulness under [Rule 608(b)] or relevant to his

---

10.     Defense counsel's inquiry into plaintiff's expert's unsuccessful PLIF surgeries was not at issue during the appeal. *Wischmeyer,* 536 NW2d at 764.

competency or knowledge." *Id*. at 767 (emphasis added); *see also Persichini*, 607

NW2d at 105 (taking guidance from *Wischmeyer*). In the other analysis, the court

held that Rule 608(b) was properly considered by the trial court[11] and the inquiry

into the unsuccessful non-PLIF surgeries was relevant to plaintiff's expert's

*competency*.[12] *Wischmeyer*, 536 NW2d at 765. In justifying this result, the court

opined:

> In this case, [plaintiff's expert] testified that defendant
> should have undertaken a more conservative course of
> treatment, implying that a more conservative treatment
> would have prevented plaintiff's injuries. Through this
> testimony, he placed his competency to condemn defendant
> in question. The cross-examination of [plaintiff's expert]
> regarding prior poor surgical results, therefore, did not
> raise extrinsic evidence prohibited by [Rule 608(b)]. *Because
> the competency of* [*plaintiff's expert*] *was properly before
> the court, evidence pertaining to his credibility was relevant.*
>
> It is intended that the Rules of Evidence promote the
> ascertainment of the truth. [[13]] Where information is relevant

---

11. The court also found that the Rule 403 was correctly considered. *Id*. at 766. Michigan's version of Rule 403 is identical to South Dakota's, which is codified at SDCL 19-12-3 and provides as follows:

    > Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

12. The court also recognized that the trial court had appropriately applied Rule 608(b) by disallowing impeachment of plaintiff's expert with extrinsic evidence and noting that the trial court stated that defense counsel "would be 'stuck with [plaintiff's expert's] answer.'" *Id*.

13. The court cited Michigan's Rule 102, which is effectively identical to South Dakota's Rule 102 codified under SDCL 19-9-2, and provides:

    > Chapters 19-9 to 19-18, inclusive, shall be construed to

    (continued . . .)

and not unduly prejudicial, it would be unwise to apply [Rule 608(b)] so that the jury is deprived of information that would assist it in its task. *We believe that this cross-examination was proper because during direct examination [plaintiff's expert]testified that he had performed hundreds of back surgeries, including PLIFs, in order to establish his competency.*

The juxtaposition of [plaintiff's expert's] testimony on direct examination and his conclusion that plaintiff's condition could only result from some negligence during surgery rendered [plaintiff's expert's] ability to perform such surgeries relevant. *"Gaps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility."* *Because expert testimony is admitted to assist the trier of fact, it was imperative that opposing counsel be afforded the opportunity to cross-examine [plaintiff's expert] to expose the weaknesses in his knowledge, skill, experience, training, or education.*

*Id*. at 765-66 (emphasis added) (internal citations omitted).

[¶18.]     In support of his position, Dr. Schwartz also cites *Martinmaas v. Engelmann*, 2000 SD 85, 612 NW2d 600. In *Martinmaas*, the defendant physician testified to the applicable standard of care and we affirmed the trial court's decision allowing plaintiffs' counsel to establish that the defendant no longer had a license, but denied defense counsel any further inquiry into the proceedings of the licensing authority or any other evidence concerning the reason the defendant physician no longer was licensed. *Id*. ¶¶54-58, 612 NW2d at 612-13. However, this case does not

---

(. . . continued)

secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the *truth may be ascertained and proceedings justly determined.*

(Emphasis added).

-11-

lend support to Dr. Schwartz, since our holding in *Martinmaas* was premised on the trial court's consideration of the fact that the defendant had surrendered his license contemporaneous with an assault charge that was adjudicated prior to trial. *See id.* ¶3. Our review of the record in *Martinmaas* revealed that plaintiffs' counsel was able to impeach the defendant's credibility by establishing that the defendant no longer was licensed. *Id.* ¶58, 612 NW2d at 613.

[¶19.] In addition, Dr. Schwartz claims *Boomsma v. Dakota, Minnesota & Eastern R.R. Corp.*, 2002 SD 106, 651 NW2d 238, *overruled on other grounds by* State v. Martin, 2004 SD 82, 683 NW2d 399, lends support to his argument. In *Boomsma*, the defendant appealed the trial court's refusal to admit evidence pertaining to plaintiff's expert's optometry license, which the expert voluntarily relinquished rather than contest *allegations* of misconduct. *Id.* ¶48, 651 NW2d at 248. Again, this case lends no support to Dr. Schwartz's position. We affirmed the trial court based on its reasoning that, in lieu of any evidence of misconduct, allowing testimony "which amounted to no more than mere allegations of misconduct" would be more prejudicial than probative. *Id.* ¶51. *Compare with* Adams v. Fuqua Industries, Inc., 820 F2d 276 (8thCir 1987) (holding that where expert testified that defendant was liable because it failed to incorporate a "state of the art" device in its lawn mower, the trial court erred by not allowing defendant to impeach expert on cross-examination about his use of the same kind of lawn mower at his place of business).

[¶20.] We have also recognized that where a witness makes an issue of his credibility by favorable direct testimony, he "'opens the door' to impeachment

evidence on cross-examination." State v. Litschewski, 1999 SD 30, ¶¶22, 23, 590 NW2d 889, 903 (citations omitted). In holding that the defendant's testimony had placed his credibility at issue, subjecting him to impeachment by contradiction on cross-examination, we noted that "even if 'the evidence is not admissible under [Rule 608(b)] it may be admissible to impeach by contradiction as allowed by SDCL 19-14-8[(Rule 607)].'"[14] Id. ¶26 (quoting State v. Byrum, 399 NW2d 334, 337 (SD 1987)) (citation omitted).

[¶21.] In this case, Dr. Schwartz established his neurosurgery practice in June 2000, immediately after completing his residency. Twenty-one months later, he operated on Kostel. In the fourteen-month period preceding Kostel's surgery, Dr. Schwartz conducted two surgeries similar to Kostel's during which, by his own deposition testimony, he made significant mistakes, and in malpractice suits were filed.[15] Ultimately, Dr. Schwartz entered into a stipulation with the Board whereby his license was placed on probationary status with numerous conditions precedent to his full reinstatement, including retraining in his chosen field and group practice for five years thereafter. The reason given by the Board for these sanctions was malpractice.

---

14. Rule 607 codified under SDCL 19-14-8 provides:

> The credibility of a witness may be attacked by any party, including the party calling him.

15. By Dr. Schwartz's own estimate, there have been over thirty suits alleging medical malpractice filed against him. However, some of those have been dismissed, three others have been tried to defense verdicts, and at least nine remain to be tried.

[¶22.]     Nevertheless, Dr. Schwartz contends that he should be able to testify without challenge to the applicable standard of care and his credentials and experience as a neurosurgeon.  This is not appropriate.  Under the trial court's ruling, had Dr. Schwartz testified as he proposed, Kostel's inquiry on cross-examination would have been based, not on allegations, but rather on Dr. Schwartz's own admissions of malpractice.  In addition, the procedures giving rise to the malpractice actions about which Kostel would have inquired of Dr. Schwartz were not of a kind remote in time or unrelated in type to Kostel's procedure.  Consequently, this inquiry would have related to Dr. Schwartz's competency and thereby would have been relevant to the assessment of his credibility in the eyes of the jury.  We find no prejudice in the trial court's conditional exclusion of evidence related to the other malpractice actions and the Board proceedings, and therefore, no abuse of discretion.[16]

[¶23.]     **2.     Whether the trial court abused its discretion when it allowed Kostel to elicit testimony from Dr. Schwartz pertaining to alleged "other acts" and when the court gave the jury an instruction limiting the applicability of the testimonial evidence obtained during this line of questioning.**

---

16.     While our conclusion on this issue did not necessitate a review of the trial court's decision to allow Dr. Schwartz to offer *lay testimony* about the surgical procedure that he performed on Kostel's spine, we reiterate our holding in *Block v. McVay*, 80 SD 469, 126 NW2d 808, 812 (1964) (emphasis added), *overruled on other grounds by Shamburger v. Behrens*, 380 NW2d 659 (SD 1986):  "Laymen cannot be expected to possess the technical knowledge and experience required to intelligently second guess a physician on diagnostic procedures and the conclusions to be drawn therefrom; this is especially true in a case such as this where the . . . *nervous* [system] of the human body [is] involved."

[¶24.]     Dr. Schwartz alleges that the trial court misapplied SDCL 19-12-5

(Rule 404(b)) when it ruled that Kostel could ask him three questions regarding

"other acts." He also contends that this alleged error was compounded and he was

unduly prejudiced when the trial court issued a jury instruction limiting the scope

of the application of his answers to the questions.

*Evidence of Other Acts*

[¶25.]     Rule 404(b) as codified at SDCL 19-12-5 provides:

> Evidence of other crimes, wrongs, or acts is not admissible
> to prove the character of a person in order to show that
> he acted in conformity therewith. It may, however, be
> admissible for other purposes, *such as* proof of motive,
> opportunity, intent, preparation, plan, *knowledge*, identity,
> or absence of mistake or accident.

(Emphasis added).

[¶26.]     Pursuant to the "other purposes" under Rule 404(b), the trial court

allowed Kostel to ask the following three questions "for the purpose of determining

whether Dr. Schwartz had the requisite skill and knowledge required of a

neurosurgeon to read and interpret the radiographic images in this case[:]"

1.   Did you misread X-rays involving spinal surgeries
     in the 14 months prior to Ms. Kostel's surgery?
2.   On how many occasions did you misread X-rays
     involving spinal surgeries during this period of time?
3.   Did you operate at a level of a patient's spine not
     consented to in the 14 months prior to Ms. Kostel's
     surgery?

Dr. Schwartz answered affirmatively to all three questions.

[¶27.]     Given that the list of "other purposes" under Rule 404(b) for which

evidence of other acts may be admitted is nonexclusive, the possible uses, other

than character, are limitless. State v. Wright, 1999 SD 50, ¶14, 593 NW2d 792,

798. Rule 404(b) is thus an inclusionary rule, not an exclusionary rule. *Id.* ¶13 (citing John W. Larson, *South Dakota Evidence* § 404.2(1) (1991)). Evidence is *only* inadmissible under the rule if offered to prove character. *Id.* (citing Larson, § 404.2(1)).

[¶28.]     Notwithstanding the inclusionary nature of Rule 404(b), the proponent of the other-act evidence has the burden of showing the relevance of the other act. SDCL 19-12-1 (Rule 401);[17] SDCL 19-12-2 (Rule 402).[18] The other-act evidence is then admissible only if the evidence is sufficient for the trial court to conclude that a jury could find by a preponderance that the other "act occurred and that the defendant was the actor." *Wright*, 1999 SD 50, ¶14, 593 NW2d at 798 (quoting Huddleston v. United States, 485 US 681, 689, 108 SCt 1496, 1501, 99 LEd2d 771 (1988)); *See also* State v. McDonald, 500 NW2d 243, 246 (SD 1993)) (additional

---

17.     Rule 401 codified under SDCL 19-12-1 provides:

>    "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

18.     Rule 402 codified under SDCL 19-12-2 provides:

>    All relevant evidence is admissible, except as otherwise provided by Constitution or statute or by chapters 19-9 to 19-18, inclusive, or by other rules promulgated by the Supreme Court of this state. Evidence which is not relevant is not admissible.

citation omitted); *see also* SDCL 19-9-8 (Rule 104(b)).[19] When evidence is found relevant, "the balance tips emphatically in favor of admission" unless the probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay, waste of time or cumulative evidence pursuant to Rule 403. *Wright*, 1999 SD 50, ¶14, 593 NW2d at 799 (quoting Edward J. Imwinkelried, *Uncharged Misconduct, Evidence* § 8.28, at 118-19 (Rev ed 1998)). The party objecting to the admission of the other-act evidence then has the burden of establishing that the concerns expressed under Rule 403 substantially outweigh the probative value. *Id.* ¶16 (quoting Larson, § 403.1; (citing Jane C. Hofmeyer, *A Relaxed Standard of Proof for Rule 404(b) Evidence: United States v. Huddleston,* 6 Cooley LRev 79 (1989))); *see also Id.* ¶15 (citing United States v. Betancourt, 734 F2d 750, 757 (11thCir 1984) (Rule 403 is an "extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence"), *reh'g denied,* 740 F2d 979 (11thCir 1984), *cert. denied,* Gerwitz v. United States, 469 US 1021, 105 SCt 440, 83 LEd2d 365 (1984)).

[¶29.] Out of the jury's presence, trial counsel argued the merits of the inclusion of evidence pertaining to the two mistakenly performed spinal surgeries conducted by Dr. Schwartz within time proximity with Kostel's. Plaintiff's counsel

---

19. Rule 104(b) codified under SDCL 19-9-8 provides:

> When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, *the introduction of evidence sufficient to support a finding of the fulfillment of the condition.*

(Emphasis added).

argued that the nature of these surgeries was relevant to the case at bar and that evidence thereof should be admitted to show the degree of knowledge and skill possessed by Dr. Schwartz. In reaching its decision, the trial court made the following assessment:

> The evidence is directed toward establishing a matter and issue other than the defendant's propensity to commit the act. [T]he evidence shows that the other act is similar enough and close enough in time to be relevant to the matter at issue. [T]the evidence is sufficient to support a jury finding that . . . Dr. Schwartz committed this similar act. [T]he probative value of the evidence is not substantially outweighed by the danger of unfair prejudice[.]

[¶30.] The trial court ultimately limited the admissible evidence to Dr. Schwartz's testimony to the three aforementioned questions, the wording of which was precisely crafted. The parties were further instructed that Dr. Schwartz could answer each question "yes or no."

[¶31.] Dr. Schwartz's other surgeries, from which the other-acts evidence was derived, were similar in kind and close in time to Kostel's surgery. Further, by his own admission, Dr. Schwartz made mistakes during those other surgeries. From Dr. Schwartz's affirmative answers to the three questions, there was sufficient evidence to reasonably conclude that the jury could find that he had made prior mistakes. Given Dr. Schwartz's defense that the expansion of the preoperative scope of the procedure was attributable to an intraoperative diagnosis of more extensive pathology requiring treatment, the evidence entered for purposes of showing his knowledge and skill was not unduly prejudicial to Dr. Schwartz. Rather, it went to establishing Kostel's claim that the two additional fusions, beyond the consented-to L4-L5, were performed in error due to his lack of

competency. Therefore, we find that the trial court did not abuse its discretion when it permitted Kostel to ask the three questions and admitted Dr. Schwartz's answers pursuant Rule 404(b).

*Instruction Limiting The Application of Rule 404(b) Evidence.*

[¶32.] "[W]e review the wording and inclusion of individual jury instructions as well as the overall arrangement of instructions under the abuse of discretion standard." Veith v. O'Brien, 2007 SD 88, ¶25, 739 NW2d 15, 23 (citing Vetter v. Cam Wal Elec. Co-op., Inc., 2006 SD 21, ¶10, 711 NW2d 612, 614 (citations omitted)). However, reviewing their correctness *in toto* and whether the jury was properly instructed overall, we apply the de novo standard. *Id.* (citing *Vetter*, 2006 SD 21, ¶10, 711 NW2d at 614 (citations omitted)).

[¶33.] Dr. Schwartz objected to Instruction No. 14, which limited the scope of the jury's consideration of Dr. Schwartz's answers to the aforementioned three questions. Instruction No. 14 provided as follows:

> The evidence that Dr. Schwartz allegedly had difficulty with or misread radiographic images on occasions separate from his care and treatment of the plaintiff, and that on occasion separate from his care and treatment of plaintiff operated at a level not consented to, was received only for limited purposes. *You may consider this evidence for the purpose of determining whether Dr. Schwartz had the requisite knowledge and skill required of a neurosurgeon to read and interpret the radiographic images in this case.* **You may not consider it for any other purpose.** Specifically, you may not infer that because Dr. Schwartz allegedly had difficulty with or misread radiographic images on occasions separate from his care of plaintiff or operated at a level not consented to that he acted in the same manner in treating plaintiff. Keep in mind as well that the fact that it is alleged that a person may have acted in a wrongful manner on a separate occasion is not evidence of any kind that the person has acted wrongfully in the matter at issue.

> You should not, as a matter of law and as a matter of fundamental fairness, assume in any way that Dr. Schwartz is or might be liable for medical malpractice simply because it has been alleged that he had difficulty with or misread radiographic images involving other individuals or operated at a level not consented to on entirely different occasions.

(Emphasis added).

[¶34.]    Initially, Dr. Schwartz argues that the trial court erred by offering Instruction No. 14 without his request. In support of his argument, he cites *Wangsness v. Aldinger*, 1999 SD 103, 598 NW2d 221 and *Hall v. Commonwealth of Kentucky*, 817 SW2d 228 (Ky 1991). However, these cases do not support his proposition. The proposition they do support is that where the appellant does not request the limiting instruction at trial and the trial court does not *sua sponte* give the instruction, the appellant cannot claim error on appeal. *See Wangsness,* 1999 SD 103, ¶20, 598 NW2d at 228; *see also Hall*, 817 SW2d at 229. Finding no error where no instruction was given and none was requested does not logically equate with a claim of error were an instruction is given and none was requested. Failure to cite relevant supporting authority is a violation of SDCL 15-26A-60(6)[20] and is deemed a waiver. State v. Boston, 2003 SD 71, ¶27, 665 NW2d 100, 109 (failure to cite relevant authority on point). Therefore, we need not address this argument.

[¶35.]    Dr. Schwartz next argues that Instruction No. 14 is erroneous because it is not supported by the evidence. *See Van Zee v. Sioux Valley Hosp.*, 315 NW2d

---

20.    SDCL 15-26A-60(6) provides in pertinent part:

> [A]n argument shall contain the contentions of the party with respect to the issues presented, the reasons therefore, and the citations to the authorities relied on.. . .

489, 492 (SD 1982) (reiterating that a trial court may present to the jury, by way of instruction, only those issues that are supported by evidence in the record). We need not expand on our prior Rule 404(b) analysis except to say that Dr. Schwartz's affirmative answers to the three other-act questions sanctioned by the trial court, *see supra* ¶26, were sufficient for the trial court to reasonably conclude that the jury could find he had made prior mistakes and that the jury could thereby consider evidence of those prior mistakes in evaluating the degree of knowledge and skill he possessed. Accordingly, we conclude that the instruction was sufficiently supported by the evidence and properly limited the scope for which it could be considered to the aforementioned purpose.

[¶36.]		Finally, Dr. Schwartz submits that Instruction No. 14 created an additional standard of care that he was required to provide Kostel. Moreover, despite the clear limitation that the instruction placed on the manner in which the jury could consider his response to the three other-act questions, acknowledging that in prior surgeries he had misread X-rays and had conducted procedures in areas of patients' spines beyond patient consent, Dr. Schwartz alleges that the instruction suggested that the jury could consider his response as evidence of negligence in the instant case. We disagree. The standard of care applicable to the determination of negligence was given to the jury with Instruction No. 12, which provided: "A neurosurgeon is negligent if he fails to *exercise* the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful neurosurgeons would possess and use in similar circumstances." (Emphasis added). Instruction No. 13 informed the jury how it could make the determination of

whether Dr. Schwartz had applied the standard of care. "You must decide whether Dr. Schwartz possessed and used the knowledge, skill, and care which the law demands based on the testimony and evidence of members of the profession who testified as expert witnesses."[21] Instruction No. 14 then provided other-act evidence as an additional basis upon which the jury could consider for the very narrow purpose of determining "whether Dr. Schwartz had the requisite knowledge and skill . . . to read and interpret radiographic images. . . ."

[¶37.] Since Instruction No. 14 was supported by Rule 404(b) evidence, and carefully limited the scope for which that evidence could be considered, we find no abuse of discretion in the trial court's inclusion of this instruction. *See Veith*, 2007 SD 88, ¶25, 739 NW2d at 23. Moreover, when read in context with other related instructions, we conclude that the jury was properly instructed overall.

[¶38.] **3. Whether the trial court abused its discretion when it refused to admit an anonymous letter sent to Kostel, the author of which was a competitor of Dr. Schwartz's and non-testifying expert for Kostel.**

[¶39.] On or about April 3, 2002, Kostel received an anonymous letter. The typewritten message stated the following:

> What happened to you in surgery was real bad. They are
> trying to cover it up. They told us all yesterday at work
> not to talk about anything that happens in the operating
> room. These things shouldn't have to happen. I copied
> this add [sic] form [sic] the phone book. This man has

---

21. Dr. Schwartz also alleges that the trial court abused its discretion when it gave Instruction No. 13. However, we also disagree with this assertion, which we will address in Issue 4.

> helped my friends.  Don't tell anybody about this letter
> I need my job and don't want to lose it.

The referenced "add," included in the envelope, was from a Yellow Pages advertisement for a personal injury attorney in Rapid City.

[¶40.]    Larry Teuber, M.D., a Rapid City neurosurgeon, ultimately admitted to being the author of the letter.[22]  Dr. Teuber had had no contact with Kostel prior to sending the anonymous letter and knew nothing of her condition at that time other than that he had heard from his associate, Edward Seljeskog, M.D., that a procedure conducted on an unnamed individual had taken longer than expected on March 8, 2002.  Teuber admitted that he wrote the letter in such a way as to make it appear as though it had been written by a nurse or a scrub technician.  Once he completed the letter and stuffed it in an envelope along with the Yellow Pages advertisement, he had his office secretary address it in her handwriting, and place it in the mail.

[¶41.]    Kostel sought a second opinion from orthopedic surgeon, Rand Schleusener, M.D., whom she first saw and began treating with on September 24, 2002.  At the request of plaintiff's counsel, Kostel was examined by Dr. Teuber on one occasion on November 26, 2002.  In addition to his examination, he reviewed a series of Kostel's MRIs dating from 1995 to 2001.  Dr. Teuber drafted a report summarizing his findings from the examination.  In this report, which was entered

---

22.    Including the letter to Kostel, Dr. Teuber admitted to sending four anonymous letters to patients of Dr. Schwartz.  *See* Dan Daly, *Black Hills Surgery Center physician's practice suspended for 90 days,* Rapid City Journal, section A, pg 1, September 13, 2005.

into evidence at trial, Dr. Teuber stated that while there was a distinct degeneration of the L4-L5 segment, the L3-L4 segment was "the only normal disc in her back" and further, that "[t]here is only a very minimal amount of degenerative change of the L5-S1 disc." Dr. Schleusener reviewed Dr. Teuber's report and spoke to him about Kostel's condition. In December 2002, Dr. Schleusener performed an anterior interbody fusion with femoral allograft spacer[23] in the L5-S1 segment to improve stability in this area near the base of Kostel's spine.[24]

[¶42.]    Kostel filed her complaint on February 14, 2003, and therein made several references to the anonymous letter. Prior to trial, Kostel filed an amended complaint in which she deleted all references to the anonymous letter. Neither Dr. Teuber nor Dr. Seljeskog was called to testify at the trial.

---

23.    An *allograft* is "[t]he transplant of . . . tissue from one individual to another . . . ." http://www.medterms.com/script/main/art.asp?articlekey=30941 (last visited August 8, 2008). This is in contrast to an *autograft,* which is "[t]issue transplanted from one part of the body to another in the same individual." http://www.medterms.com/script/main/art.asp?articlekey=40486 (last visited August 8, 2008). Dr. Schleusener testified that he removed the disk from the L5-S1 segment of Kostel's spine and replaced it with a bone graft called a "femoral allograft spacer." He described the spacer as "a piece of femur that's cut into the shape of a wedge-shaped donut from [a] cadaver."

24.    At trial, Dr. Schleusener testified that an anterior interbody fusion is a fusion performed on the front of the spine. He stated that at least one pedicle screw that Dr. Schwartz had placed in the sacrum was not seating properly. He indicated that the sacrum differs from the other spinal bones in that the bone material in the sacrum does not make as secure an anchorage for screws and suggested that the problem with the screw that was not seating properly may have been attributable to the long, three-segment fusion that Dr. Schwartz had performed on Kostel from L3-L4 to L5-S1, the entire span of which was being anchored at the sacrum.

[¶43.]     Dr. Schleusener continued to treat Kostel through the time of the trial, and along with Quentin Durward, M.D., a neurosurgeon from Dakota Dunes, South Dakota, they testified as plaintiff's experts at trial. Both testified that the L4-L5 segment, to which Kostel had consented to surgery, was an appropriate candidate for fusion at the time Dr. Schwartz operated on Kostel. They also testified that the L3-L4 segment was not in need of treatment and that there was no medical reason to remove the disk there and fuse that segment. In addition, they agreed that there had been no preoperative need to perform the fusion at L5-S1.

[¶44.]     On May 26, 2006, the trial court issued an order suppressing Dr. Teuber's anonymous letter and the Yellow Pages advertisement, following Kostel's motion and brief in support thereof in which she argued that said items should be precluded for lack of relevance. *See supra* n17 (citing SDCL 19-12-1 (Rule 401)) and n18 (citing SDCL 19-12-2 (Rule 402)). Dr. Schwartz asserts that this was error and that the letter was relevant and should have been admissible.

[¶45.]     First, Dr. Schwartz argues that the anonymous letter had relevancy to why Kostel lost trust in him. Second, he contends that the letter could have been used to refute Dr. Teuber's November 26, 2002 examination report. Finally, he alleges that Dr. Teuber was motivated out of deep personal animus stemming from his position as a competitor of Dr. Schwartz's. Dr. Schwartz also cites the fact that Dr. Teuber and Dr. Schleusener are part owners of the Black Hills Surgical Center. Coupled with the fact that Dr. Schleusener reviewed Dr. Teuber's findings and spoke with him prior to performing his own procedure on Kostel, Dr. Schwartz

contends that Dr. Schleusener was influenced by Dr. Teuber and that the letter was relevant to put that influence into context.

[¶46.] We find these arguments to be attenuated and see no reason to disturb the trial court's decision regarding this discretionary decision. The record reflects that Kostel was suffering from postoperative distress to a degree significant enough to justify seeking another opinion notwithstanding her receipt of the anonymous letter. Moreover, we fail to see the manner in which the letter could have served to refute Dr. Teuber's examination report or undermine Dr. Schleusener's testimony. Beyond the fact that their concurring opinions about Kostel's condition were corroborated at trial by an unrelated physician from the other end of the state, Dr. Schleusener commenced a long-term, medical-care relationship with Kostel during which he made his own diagnoses and conducted his own procedures. It is hard to conceive how the anonymous letter would have in someway shown that Dr. Schleusener subordinated his own judgment in the treatment of Kostel by succumbing to animus motivated influence by Dr. Teuber.

[¶47.] **4. Whether the trial court abused its discretion by the inclusion of jury instructions objected to by Dr. Schwartz and the denial of others that he requested.**

[¶48.] Dr. Schwartz alleges numerous examples of reversible error in the selection of jury instructions.

*Requested Instruction No. 13*

[¶49.] In addition to the preoperative diagnosis of a degenerative vertebral segment at the L4-L5 location in Kostel's spine for which she had consented to fusion surgery, Dr. Schwartz avers that he discovered additional pathology

requiring treatment once surgery had commenced. As such, he asserts that he did not breach the applicable standard of care by expanding the preoperative scope of the procedure to include additional treatment. He, therefore, argues that he was unduly prejudiced when the trial court refused him the following "error in judgment" instruction:

> A physician is not necessarily negligent because the physician errs in judgment or because efforts prove unsuccessful.
>
> The physician is negligent if the error in judgment or lack of success is due to a failure to perform any of the duties as defined in these instructions.

[¶50.] We recently explained in *Papke v. Harbert*, 2007 SD 87, ¶50 n15, 738 NW2d 510, 527 n15 that in the medical malpractice setting this instruction is only to be given when the physician is presented with multiple treatment options that are viewed as acceptable in the subject field of practice. We also emphasized that even in this limited area of application, an error-in-judgment instruction cannot propose that the physician may commit mere error or mistake and not be liable. *Id.*

[¶51.] This case does not present an appropriate application for the requested instruction. The issue here was not whether Dr. Schwartz erred in choosing one of multiple acceptable methods to treat Kostel's spine. The issue was whether he negligently made a mistake by fusing two vertebral segments that did not need to be fused. Accordingly, the trial court was correct in refusing Dr. Schwartz's requested instruction.

*"Unfortunate or Bad Condition" Instruction*

[¶52.]     The trial court gave the following instruction designated as Instruction

No. 15:

> A finding of negligence may not be based *solely* on evidence
> of bad result to the claimant in question, but a bad result
> may be considered by you, *along with other evidence*, in
> determining the issue of negligence.  You are the sole judges
> of the weight to be given to this kind of evidence.

(Emphasis added).  Dr. Schwartz contends that instructing the jury that it could

consider Kostel's *bad result* along with other evidence in deciding whether Dr.

Schwartz had been negligent was an abuse of discretion under the circumstances.

In support of his position, he compares this Court's analyses in *Hansen v. Isaak*, 70

SD 529, 19 NW2d 521 (1945) and *Shamburger v. Behrens*, 380 NW2d 659 (SD

1986).

[¶53.]     In *Hansen*, this Court in effect characterized the factual circumstances

as a *res ipsa loquitur* case, where the presence of negligence speaks for itself

without the need for expert testimony to show a breach of the standard of care.  70

SD at 530, 19 NW2d at 522.  Plaintiffs' child was burned by a device that was

operated by and under the exclusive control of the defendant chiropractor at all

times relevant.  While the plaintiffs submitted expert testimony at trial that when

the device of the type that injured the plaintiff was operated correctly no burn

would result, they offered no expert testimony as to the applicable standard of care

in operating such a device.  *Id.* at 532, 19 NW2d at 523.  The trial court entered a

directed verdict for the defendant.  *Id.* at 531, 19 NW2d at 521.

[¶54.]    Reversing the directed verdict, this Court concluded that "[t]he character of the injury in connection with other facts and circumstances and the fair inferences which the jury could draw from them constitute substantial credible evidence and would have sustained a verdict for the plaintiff." *Id.* at 534, 19 NW2d at 523. In reaching this conclusion this Court set out the applicable rule in a case of *res ipsa loquitur*:

> "[W]hile the result alone is not, in itself, evidence of negligence, yet same may nevertheless be considered, together with other facts and circumstances disclosed by the evidence in a given case in determining whether or not such result is attributable to negligence or want of skill."

*Id.* at 533, 19 NW2d at 522 (quoting Berg v. Willett, 232 NW 821, 823 (Iowa 1930)) (citations omitted).

[¶55.]    In *Shamburger*, the plaintiff underwent colon surgery and thereafter his condition inexplicably deteriorated. 380 NW2d at 661. Eventually, it was determined that the plaintiff had developed an abscess at the location where the colon had been resected. Following the presentation of evidence at the trial on the plaintiffs' malpractice suit, the trial court instructed the jury as follows: "The fact that an unfortunate or bad condition resulted to Plaintiff . . . during the care afforded to him by Defendant . . . *does not alone* prove that Defendant . . . was negligent."[25] *Id.* at 663 n5 (emphasis added).

---

25.    In the interest of clarity, we note that "Instruction No.7" from *Shamburger*, cited in its entirety, provided in relevant part as follows:

> If a board-certified general surgeon brings to his patient care, skill and knowledge of the reasonable board-certified surgeon,

(continued . . .)

[¶56.]　　　　On appeal, the plaintiff in *Shamburger* argued that the instruction was prejudicial and did not properly instruct the jury on causation without the inclusion of language from the rule set out in *Hansen* – that his bad result was some evidence in itself that could be considered with other evidence in the record in determining whether the physician had been negligent. *Id.* at 663. This Court affirmed the instruction given by the trial court based on the distinction between the factual circumstances in *Hansen* and the case at bar. *Id.* at 664. Significant to this Court was that unlike the injury in *Hansen*, the injury to the *Shamburger* plaintiff "was not the type . . . which *in and of itself* could be evidence of negligence." *Id.* (emphasis added).

---

(. . . continued)

> he is not liable to that patient for damages resulting from a good faith error of judgment which he may have been guilty. The law requires a board-certified surgeon to base any professional decision he made on skill and careful study and consideration of the case, but when the decision depends upon the exercise of judgment, the law requires only that the judgment be in good faith. A board-certified surgeon is not an insurer of the correctness of his judgment or the end result of his medical treatment.

> *The fact that an unfortunate or bad condition resulted to Plaintiff . . . during the care afforded to him by Defendant . . . does not alone prove that Defendant . . . was negligent.*

380 NW2d at 663 n5. (Emphasis added).

Although in *Shamburger,* this Court affirmed the second paragraph of the instruction, which is relevant to our analysis in the instant case, this Court reversed the trial court's inclusion of the "good faith error in judgment" language in the first paragraph of Instruction No. 7. *Id.* at 663.

[¶57.] Returning to the instant case, Instruction No. 15 clearly allowed the jury to consider Kostel's bad result along with other evidence in reaching its finding of negligence. Dr. Schwartz contends that the trial court should have given an instruction similar to the *Shamburger* instruction because, as in *Shamburger*, this too is a case in which negligence is not apparent without expert testimony and such an instruction would have informed the jury that Kostel's "bad result" was *no* evidence of negligence.

[¶58.] However, *Shamburger* did not go that far. It is clear that while this Court did not intend for a "bad result," arising out of circumstances comparable to *Shamburger*, to *alone* prove negligence, the *Shamburger* instruction does not foreclose the jury from considering the "bad result" along with other evidence in determining whether the defendant was negligent. *See id.* at 663; *see also supra* ¶55. Therefore, we find that the trial court did not abuse its discretion when it instructed the jury that it could consider Kostel's bad result along with other evidence in determining whether Dr. Schwartz was negligent. *See* Kennelly v. Burgess, 654 A2d 1335, 1370 (Md 1995) (in a case where plaintiff suffered brain injury during an operation on his sinus cavity and experts disputed whether defendant physician met the applicable standard of care, the court opined that instructing the jury that "[a]n unsuccessful result following medical treatment is *not evidence* of negligence" implying to the jury that the bad result was "*no evidence at all* of negligence") (emphasis added). As such, in *Kennelly* the court held that the instruction was erroneous because the "well settled principle that no presumption or inference of negligence arises from the bare happening of [a bad result]" meant

the bad result "may nonetheless be taken into consideration in assessing negligence." *Id*. at 1340-41 (citations omitted).

[¶59.]        Moreover, we conclude that the jury was properly instructed overall in this regard. While the jury was instructed that it could consider Kostel's bad result along with other evidence in reaching a finding that Dr. Schwartz was negligent, such could not be reached unless it concluded he had failed to provide the applicable standard of care set out in other instructions. *See* Williams v. Viswanathan, 64 SW3d 624 (TexCtApp 2001) (holding in a medical malpractice case where an alert and responding, near-drowning victim died after receiving emergency room treatment and the record reflected that there was dispute among experts whether defendant physician had provided decedent with the applicable standard of care, trial court did not abuse its discretion when it instructed the jury that while it could not base a finding of negligence "solely on evidence of a bad result," a bad result could be considered "along with other evidence"); *see also Kennelly*, 654 A2d at 1343.

*Instruction No. 13*

> You must decide whether Dr. Schwartz possessed and
> used the knowledge, skill, and care which the law demands
> based on the testimony and evidence of members of the
> profession who testified as expert witnesses.

[¶60.]        Dr. Schwartz objected to the trial court's utilization of Instruction No. 13 arguing that it precluded the jury from considering the opinions and conclusions of lay witnesses in determining whether Dr. Schwartz had met the applicable standard of care. Specifically, Dr. Schwartz references his own "lay" testimony and that of certified nurse practitioner Bonnie Miller and physician assistant Daryl Sieg. Dr. Schwartz proposed Requested Instruction No. 11.

You must decide whether Dr. Schwartz used the skill and care which the law demands based on the testimony and evidence of neurosurgeons who testified as expert witnesses.

*However, you are permitted to consider the opinions and conclusions of lay witnesses on those subjects which are within the common knowledge and comprehension of people who have ordinary education, experience, and opportunity for observation.*

[¶61.]     Dr. Schwartz argues that *Magbuhat v. Kovarik*, 382 NW2d 43, 46 (SD 1986) (citations omitted) supports the use of his proposed instruction over the instruction that was given. In *Magbuhat* this Court reiterated the general rule that "in medical malpractice cases that negligence must be established by the testimony of medical experts," because a verdict in a malpractice case cannot be based on "speculation and conjecture." In support of his proposed jury instruction, Dr. Schwartz cites to the Court's subsequent clarification in *Magbuhat*, "[t]he rule does not exclude the opinions and conclusions of *lay witnesses* on subjects which are within the common knowledge and comprehension of persons possessed of ordinary education, experience and opportunity." *See id.* (citations omitted). However, the Court conditioned the extension of the rule for the inclusion of lay testimony on the type of circumstance such as when "a physician operates on a patient's knee, [and then] the wrong knee [is] treated," because under that kind of circumstance, "the lay witness could establish [the error] without indulging in speculation and conjecture or knowledge beyond a layperson's realm." *Id.* The complexity of neurosurgery does not pose that kind of self-evident situation. *See* Block v. McVay, 80 SD 469, 476, 126 NW2d 808, 812 (1964), *overruled on other grounds by Shamburger*, 380 NW2d at 663. We agree with the rationale of the trial court in

rejecting Dr. Schwartz's Requested Instruction No. 11 in favor of Instruction No. 13,

because "*no lay opinions and conclusions . . . were received or allowed in this case*"

relevant to the issues before the jury.  (Emphasis added).

### Instruction No. 10

> A legal cause is a cause that produces a result in a natural and probable sequence, and without which the result would not have occurred.
>
> The legal cause need not be the only cause, nor the last or nearest cause.  A legal cause may act in combination with other causes to produce a result.  It is sufficient if it occurs with some other cause acting at the same time, which in combination with it causes the injury.  However, for legal cause to exist, you must find that the conduct complained of was a *substantial factor* in bringing about the harm.

(Emphasis added).

[¶62.]        Dr. Schwartz argues that Instruction No. 10 was incomplete, without

expansion on the term "substantial factor."  He proposed an instruction that

included factors to consider in determining "substantial factor" from Restatement

(Second) of Torts, section 433 cited in *Mulder v. Tague*, 85 SD 544, 549-50, 186

NW2d 884, 887 (1971), where this Court adopted "substantial factor" as the

determination of whether an act is the proximate or legal cause for a plaintiff's

damages.  The Restatement factors for determining whether an act is a substantial

factor are as follows:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created

> a situation harmless unless acted upon by other forces
> for which the actor is not responsible;

(c) lapse of time.

*Id.* (quoting Restatement (Second) of Torts § 433).

[¶63.] Dr. Schwartz argues that, without setting out the above factors in an instruction, the jury could not properly evaluate the significance of the role that the surgery played in Kostel's postoperative condition in the context of other factors such as the degree of deterioration in her pre and postoperative physical condition the state of her mental health, and the extent to which Dr. Teuber may have exploited her mental health for his own ends by sending her the anonymous letter.

[¶64.] Dr. Schwartz does not cite any authority that would compel a trial court to include the "substantial factor" evaluation instruction he proposed. In this case we conclude that there was evidentiary support for the jury to find that the surgery he performed on Kostel was a substantial factor in the postoperative condition of her spine notwithstanding the other *factors* he cites. The record reflects evidence to the effect that Kostel, although suffering discomfort in her back and lower extremities from a degenerative L4-L5 vertebral segment, nonetheless maintained full employment and a reasonably active lifestyle prior to surgery. Kostel was forty-four years old at the time of the surgery. During the surgery, where it had been originally intended that the L4-L5 segment would be fused, two other segments were also fused. There was expert testimony that at least one of the two additional segments that were fused required a follow-up procedure within nine months. There was also expert testimony that adjacent vertebral segments subsequently became involved due to repetitive contact with a rod that had been

placed in Kostel's spinal column during the initial surgery performed by Dr. Schwartz. There was expert testimony that these adjacent vertebral segments became involved to an extent during the four-year period following the March 8, 2002 surgery that Kostel ultimately had to have all of her lumbar vertebral segments and several of her thoracic vertebral segments fused to the point that her spine is now frozen from her tailbone to the middle of her shoulder blades.

[¶65.]    We find no abuse of discretion in the settlement of Instruction No. 10 and that the jury was instructed properly overall in regard to "legal cause" and its "substantial factor" prerequisite.

*Credibility Instructions*

[¶66.]    Dr. Schwartz objected to the following instructions as insufficient on the matter of witness credibility.

*Instruction No. 5*:

> You may have heard the terms "direct evidence" and "circumstantial evidence." The law makes no distinction between direct and circumstantial evidence. The jury must simply determine the facts from the greater convincing force of all the evidence in the case, both direct and circumstantial.
>
> *You are the sole judges of all the facts and the credibility of the witnesses.*

(Emphasis added).

*Instruction No. 7:*

> If you believe that any witness testifying in this case has knowingly sworn falsely to any material matter in this case, then you may reject all of the testimony of the witness.

[¶67.] Dr. Schwartz argues that the jury also had to be instructed on how to judge credibility. He cites *State v. Hanley*, 58 SD 191, 235 NW 516 (1931) and *Frazier By and Through Frazier v. Norton By and Through Norton*, 334 NW2d 865 (SD 1983) in this regard. These cases, however, are not supportive. In *Hanley*, this Court reviewed an instruction that was effectively the same as the "*falsus in uno, falsus in omnibus*" Instruction No. 7, but for the addition of a clause at the end of the instruction qualifying the basis under which the jury could disregard all of a witness's testimony – "in so far as you believe it to be false." 58 SD at 193, 235 NW at 517. This Court held that the additional qualifying phrase was erroneous because it was the province of the jury to reject even witness testimony that it believed to be true when it believed that at another time that witness testified falsely. *Id.* at 194, 235 NW2d at 517-18. However, the Court held the erroneous instruction was not reversible error because the trial court included an additional instruction that informed the jury on how to assess credibility. *Id.* at 195, 235 NW2d at 518.

[¶68.] In *Frazier,* the appellants objected to the trial court's rejection of their proposed instruction designed to address witness credibility in regard to prior inconsistent statements. 334 NW2d at 867. The trial court instead gave an instruction on how to assess credibility. This Court held that the trial court's choice of instruction was not erroneous in the context of a *falsus in uno, falsus in omnibus* instruction that was also given. *Id.* at 869.

[¶69.] It does not logically follow from the holdings in *Hanley* and *Frazier* that Instruction Nos. 5 and 7 were incomplete or erroneous without an additional

instruction on how to assess credibility. We find no abuse of discretion in the trial court's refusal to instruct in this regard and infer that the court assessed the jury competent to judge credibility without the additional instruction.[26]

[¶70.]     We conclude the jury was instructed properly overall and that Dr. Schwartz has shown no basis on any of his charges of error upon which we could decide there would have been a different outcome had the jury been instructed as he proposed.

[¶71.]     **5.     Whether the trial court abused its discretion by the *sua sponte* preclusion of evidence related to Kostel's history of psychiatric disorders.**

[¶72.]     Kostel had a history of psychiatric treatment for a variety of disorders prior to the surgery. Kostel's medical records indicated that she had received counseling or treatment for anxiety, depression, post-traumatic stress disorder stemming from abuse, suicidal tendencies, self-destructive behavior, and multiple

---

26.     While we find no error with the trial court's selection of jury instructions pertaining to witness credibility, in the future claims of error in this regard could largely be avoided by the inclusion of an instruction similar to South Dakota Pattern Jury Instruction (SDPJI) 2-01. SDPJI 2-01 provides:

> You are the sole judges of all facts and credibility of witnesses. In deciding what testimony to believe, you may consider:
>
> (1)     the witnesses' ability and opportunity to observe;
> (2)     their intelligence;
> (3)     their memories;
> (4)     their manner while testifying;
> (5)     whether they said or did something different at an earlier time;
> (6)     their qualifications and experience;
> (7)     any apparent interest, bias, or prejudice they may have; and
> (8)     the reasonableness of their testimony in light of all the evidence in the case.

personality disorder. Kostel also had made several attempts at suicide and had been prescribed several forms of psychotropic medication.

[¶73.]     When Kostel began consultation with Dr. Schwartz she completed a patient-intake form on which she indicated that she had a history of anxiety, but no other psychiatric conditions. At the time of the March 8, 2002 surgery, Dr. Schwartz was not aware of Kostel's history of other psychiatric disorders. With the exception of anxiety and depression, the trial court suppressed all other evidence or references to Kostel's history of other psychiatric disorders.

[¶74.]     We will address Dr. Schwartz's claims of error as they relate to liability and damages.

*Liability*

[¶75.]     Dr. Schwartz claims that evidence of the full extent of Kostel's history of psychiatric disorders would have revealed other factors that were responsible for her postoperative condition. Dr. Schwartz cites the respective depositions of Drs. Durward, Schleusener, Seljeskog and Teuber, who all stated that a patient's psychiatric health is relevant to a neurosurgeon because it effects the patient's recovery. He also cites the offer of proof in this regard provided by defense expert Dr. Mark Eichler. Dr. Schwartz also claims that information about Kostel's psychiatric disorders would have provided impeachment evidence pertinent to her ability to accurately perceive and recall events occurring around the relevant time.

[¶76.]     The trial court was skeptical of the foundation for the neurosurgeons' claims about the relevancy of psychiatric health to surgical recovery and their qualifications to testify thereto. The trial court told defense counsel that he would

have to make a satisfactory offer of proof before any such testimony would be allowed. To this end, defense counsel offered the testimony of his last witness, Dr. Eichler, who was familiar with and had conducted presentations on the affects of psychiatric health on patient recovery. The trial court conducted a *Daubert* hearing during which Dr. Eichler presented medical literature and other information about selection of surgical candidates and their expected surgical outcomes based in part on their psychological profiles.

[¶77.]	The trial court rejected the offer of proof finding that Dr. Schwartz had failed to show that a neurosurgeon was qualified as an expert under SDCL 19-15-2 (Rule 702)[27] to testify about psychological disorders. The court also concluded that the supporting literature was not satisfactory to meet the *Daubert* standard applied in South Dakota.[28] Moreover, the court stated that Dr. Schwartz's previously

---

27.	Rule 702 codified under SDCL 19-15-2 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

28.	The standard for determining whether an expert's theory or method qualifies as scientific, technical, or specialized knowledge requires application of the following nonexclusive list of factors for assessing admissibility at trial:

> (1) whether the method is testable or falsifiable;
> (2) whether the method was subjected to peer review;
> (3) the known or potential error rate;
> (4) whether standards exist to control procedures for the method;
> (5) whether the method is generally accepted;
> (6) the relationship of the technique to methods that have been established as reliable;
> (7) the qualifications of the expert; and
> (8) the non-judicial uses to which the method has been put.

(continued . . .)

unannounced intention to have Dr. Eichler opine at a *Daubert* hearing about psychological aspects of surgical recovery was not timely noticed and denied Kostel an opportunity to discover Dr. Eichler's basis. *See* Peters v. Hoisington, 72 SD 542, 552, 37 NW2d 410, 415 (1949) (opining that when deciding whether to allow an expert to testify, the trial court has broad discretion to take into consideration how much notice the adverse party has been provided so as to "guard against surprise and to enable an adversary to investigate the professional standing of the proposed expert witness").

[¶78.] In regard to Dr. Schwartz's claim that the suppressed evidence had impeachment value, he argues that a former co-worker of Kostel's would have offered testimony about "black-outs" that Kostel allegedly told the co-worker she had experienced that were attributable to her multiple personality disorder. However, Dr. Schwartz offered no authoritative evidence on multiple personality disorder or how it may have affected Kostel's perceptions and recollections.

[¶79.] "[A] trial judge must ensure that an expert's testimony rests on both a 'reliable foundation and is relevant to the task at hand.'" Rogen v. Monson, 2000 SD 51, ¶13, 609 NW2d 456, 459 (quoting State v. Hofer, 512 NW2d 482, 484 (SD 1994 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 US 579, 113 SCt 2786, 125 LE2d 469 (1993))). When ruling on the admissibility of expert opinion, the trial court must function as a gatekeeper. *Id*. (quoting Kuper v. Lincoln-Union

_____

(. . . continued)

State v. Guthrie, 2001 SD 61, ¶35, 627 NW2d 401, 416 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 US 579, 593-95, 113 SCt 2786, 2796-98, 125 LE2d 469 (1993)).

Elec. Co., 1996 SD 145, ¶41, 557 NW2d 748, 760). In this regard the trial court's discretionary authority is broad. Wells v. Howe Heating & Plumbing, 2004 SD 37, ¶16, 677 NW2d 586, 592 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 US 137, 152, 199 SCt 1167, page, 143 LEd2d 238 (1999)).

[¶80.]     We can infer from the record that the trial court had great concern about the probative value of Kostel's history of psychiatric disorders as balanced against the prejudicial effect of admitting such evidence of uncertain relevance. The court appears to have decided on a compromise by allowing Dr. Schwartz to inquire into her history of anxiety and depression. However, the record reveals that the trial court, after reviewing the respective depositions of the neurosurgeons, the literature provided by the defense, and after conducting a *Daubert* hearing, was unconvinced as to the relevance of Kostel's psychiatric disorders in relation to her surgical recovery or the qualifications of the neurosurgeons to provide testimony in that regard.

[¶81.]     Moreover, we would point out that the evidence of Kostel's psychiatric disorders would have involved disclosure of hundreds of pages of material otherwise covered under the therapist-patient privilege. Confidentiality is the *sine qua non* of that relationship. State v. Herendeen, 613 SE2d 647, 649 (Ga 2005) (citing Jaffee v. Redmond, 518 US 1, 10-11, 116 SCt 1923, 1928, 135 LEd2d 337 (1996)). "Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure. . . ." *Jaffee*, 518 US at 10, 116 SCt at 1928, 135 LE2d 337. "It is difficult if not impossible for psychotherapists to function without being able to assure patients of confidentiality

and, indeed, privileged communication." Desclos v. S. New Hampshire Med. Ctr., 903 A2d 952, 956-57 (NH 2006). This is not intended to say that there is never a place for discovery and disclosure of a party's confidential psychological health information, but merely that the trial court, before sanctioning such discovery and disclosure, consider thoroughly and proceed with great care so as not to open that door for an inappropriate purpose. Finally, we think it worthy to emphasize that the issue of whether Dr. Schwartz was negligent in this case did not turn on Kostel's psychiatric health or lack thereof, but rather on whether he provided the applicable standard of care in conducting the surgical procedure. Accordingly, on the issue of liability we find no abuse of discretion in the trial court's refusal to allow Dr. Schwartz's inquiry into Kostel's history of psychological disorders.

*Damages*

[¶82.] Dr. Schwartz also argues that evidence of Kostel's history of psychological disorders was relevant on the issue of damages. Dr. Schwartz avers that had the bulk of the psychological evidence been admitted it would have been apparent that the quality of Kostel's life prior to surgery was less than she, her lay witnesses, and plaintiff's counsel during closing argument claimed it to be.

[¶83.] Where physical pain and suffering absent mental anguish impairs the enjoyment of life, the mere fact a plaintiff's complaint references loss of enjoyment of life is not a basis upon which to place that plaintiff's mental or emotional state at issue. Garbacik v. Wal-Mart Transp., LLC, 932 So2d 500, 504 (FlaCtApp 2006). "In the event that the plaintiff's claim for loss of enjoyment is limited solely to the physical effects of the defendant['s] alleged malpractice, then questioning regarding

the plaintiff's mental state would be improper." Mora v. Saint Vincent's Catholic Med. Ctr., 800 NYS2d 298, 302 (NYSupCt 2005).

[¶84.]     There was evidentiary support for plaintiff's counsel's summary during closing argument to the degree of activity to which Kostel was accustomed in her life before Dr. Schwartz performed surgery on her on March 8, 2002.

> She had fun, she rode horses, and she enjoyed life. . . .
> She played with her kids, she was the soccer mom, she
> kicked the ball around[. N]ot even two weeks before the
> surgery, she's down on the floor, playing with her grandchild.

[¶85.]     Evidence was presented at trial that because Kostel's spine has been fused from tailbone to shoulder blades, Kostel, who is now forty-eight years old with Bachelor's and Master's degrees in social work, is unable to work and resides in an assisted living facility for the elderly. She takes a variety of pain medications and requires assistance with such routine daily activities as preparing her meals and vacuuming her apartment.

[¶86.]     The basis upon which Kostel claimed damages was grounded not on the difference between her psychological state before and after surgery, but on the difference between being able to function as a reasonably fit person before surgery and being nearly incapacitated by the time of trial. We find no abuse of discretion in the trial court's refusal to allow inquiry into Kostel's history of psychological disorders for purposes of the jury's assessment of damages.

[¶87.]     **6.     Whether the trial court erred when it excluded evidence that portions of Kostel's medical bills were "written off" pursuant to federal laws governing the billing of Medicare beneficiaries.**

[¶88.]     Before trial, the court denied Dr. Schwartz's motion to preclude Kostel from claiming damages for that portion of her medical expenses that were "written

off" by her healthcare service providers in accordance with their agreements with Medicare, whereby charges to Medicare recipients are limited. Kostel's billed medical charges totaled $210,219.00. The amount actually paid in satisfaction of the billed charges less Medicare "write offs" was $94,727.41. Dr. Schwartz argues that the trial court allowed Kostel a windfall of $115,491.59 by precluding disclosure of the "written off" portion of the medical charges.

[¶89.]    Until recently, there was a question as to whether South Dakota's collateral source rule that this Court recognized in *Moore v. Kluthe & Lane Ins. Agency Inc.*, 89 SD 419, 234 NW2d 260 (SD 1975) applied to Medicare "write offs." In that case this Court held "[t]otal or partial compensation received by an injured party from a collateral source, wholly independent of the wrongdoer, does not operate to reduce the damages recoverable from the wrongdoer." *Id.* at 434, 234 NW2d at 269 (citations omitted). We settled this matter in *Papke*, 2007 SD 87, ¶¶ 79-80, 738 NW2d at 536. While reiterating our settled law "that plaintiffs are entitled to recover the reasonable value of their medical services, and what constitutes a reasonable value for those services is a jury question[,]" we held that the collateral source rule applies to Medicare "write offs" such that the jury's determination of the reasonable value of medical services shall begin with the amount of medical service billed, before any Medicare "write off." *Id.* ¶78, 738 NW2d at 535. As such, we find no error in the trial court's decision to allow Kostel to present those amounts for the jury's consideration.

[¶90.]    **7.    Whether the trial court abused its discretion by denying Kostel's request for a jury determination on her claim for punitive damages.**

[¶91.]    Kostel argues that the character of the harm inflicted upon her by Dr. Schwartz was such that punitive damages were in order and that the jury should have been instructed as to that option.  Before a punitive damages claim can be submitted to the jury "a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against" must be shown by "clear and convincing evidence[.]"  SDCL 21-1-4.1  In other words, the claimant must make "a prima facie showing that punitive damages *may* be in order."  Flockhart v. Wyant, 467 NW2d 473, 475 (SD 1991) (emphasis in original).  While there was sufficient evidence in this case to support a jury finding of negligence warranting compensatory damages, we find no basis upon which to conclude Dr. Schwartz's conduct in treating Kostel rose to a level that would have justified sending the issue of punitive damages to the jury.  Therefore, we find no abuse of discretion in the trial court's decision denying Kostel's request for a jury instruction on punitive damages.

[¶92.]    Affirmed.

[¶93.]    MEIERHENRY, Justice, and HOFFMAN, Circuit Judge, concur.

[¶94.]    ZINTER, Justice, and WILBUR, Circuit Judge, concur specially.

[¶95.]    WILBUR, Circuit Judge, sitting for SABERS, Justice, disqualified.

[¶96.]    HOFFMAN, Circuit Judge, sitting for KONENKAMP, Justice, disqualified.

ZINTER, Justice (concurring specially).

[¶97.]     I concur and write on Issue 5 regarding the trial court's partial exclusion of evidence relating to Kostel's mental health.[29]  I agree with the Court's affirmance of the trial court's decision to deny Dr. Schwartz's requested use of *all* of Kostel's mental health history.  I write to explain my view of this issue, including additional factual support for our decision.  I also write to explain my view of the Court's discussion regarding the interplay of privilege on the issues.

[¶98.]     On the issue of liability, which involves Kostel's ability to physically heal after the surgery, I would hold that the lack of notice alone justified the preclusion of Dr. Eichler's testimony.  With respect to other requested uses of her mental health history with respect to liability,[30] I would hold that absent a foundational showing of a relationship between the precluded evidence and her ability to physically heal, the trial court did not abuse its discretion.

[¶99.]     With respect to the related matter of privilege, the Court's suggestion that some of Kostel's history may have been excluded by the therapist-patient privilege should, in my view, be read narrowly.  *See supra* ¶81.  I agree that because Dr. Schwartz failed to prove that Kostel's mental health history was relevant to liability, it was protected by the privilege with respect to that issue.  *See* SDCL 19-

---

29.    Although Dr. Schwartz complains that he was not able to pursue some mental health history issues he raised in opening statement, informing a jury that certain evidentiary matters will be produced is always subject to subsequent admissibility determinations by the trial court.

30.    The medical evidence on this issue reflected that significant mental health issues may make it more complicated or difficult to treat a patient.

13-11 (only requiring a waiver of the therapist-patient privilege when the evidence is relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which the patient relies upon the condition as an element of her claim or defense); SDCL 19-2-3 (only requiring a waiver of the privilege when the physical or mental health of any person is in issue). Because Kostel's mental health history was not shown to be relevant to her ability to physically heal, it may have been privileged[31] with respect to liability. Nevertheless, in my view it was admissible to the extent it was relevant to the damage issue discussed below. *See Maynard v. Heeren*, 1997 SD 60, ¶11, 563 NW2d 830, 834-35 (concluding that even if the emotional and mental state of a plaintiff is not an element of the plaintiff's causes of action, mental condition is not privileged when relevant to the question of damages).

[¶100.]     With respect to damages, Kostel sought to be compensated for loss of enjoyment of life due to her physical disabilities caused by Dr. Schwartz's treatment. Although Kostel claimed that her mental health history was irrelevant to this narrow claim,[32] she is mistaken because the record reflects that the non-physical aspects of her loss of enjoyment of life claim could have been caused or

---

31. Privilege does not appear to be a basis for the trial court's decision, and it was not briefed on appeal. Consequently, in my view, the Court's discussion of this issue is dictum.

32. Kostel dropped her pleaded claims for emotional distress and mental anguish. Dr. Schwartz did not offer evidence reflecting that the disallowed portions of Kostel's mental health history affected her credibility by illuminating her powers of perception and ability to testify with accuracy.

exacerbated by her mental health problems.[33]  Therefore, some of Kostel's mental health history was relevant and admissible with respect to her claimed inability to enjoy life.  *See id.*

[¶101.]     The trial court recognized the relevancy of this evidence on the issue of damages, but carefully excluded those portions of Kostel's history that were irrelevant and overly prejudicial.  For example, on numerous occasions the court explained that it was allowing Kostel's history of depression and anxiety as relevant to the claimed loss of enjoyment of life, but the court did not allow evidence of blackouts, post-traumatic stress syndrome, suicide, and multiple personality disorders that related to childhood sex abuse.[34]  Thus, the court allowed evidence of Kostel's hospitalizations reflecting a lengthy history of depression and anxiety, one of which reflected recurrent and severe depression, despondency, panic attacks,

---

33.     The Court mistakenly relies on *Garbacik v. Wal-Mart Transp., LLC,* 932 So2d 500, 504 (FlaDistCtApp 2006) (stating that the mere allusion to loss of enjoyment of life, *without more*, does not place the mental or emotional condition of the plaintiff at issue so as to waive the medical privilege) and *Mora v. Saint Vincent's Catholic Med. Ctr. of New York,* 800 NYS2d 298, 302 (2005) (stating that in the event the plaintiff's claim for loss of enjoyment of life is *limited solely* to the physical effects of defendants' alleged malpractice, then questioning regarding the plaintiff's mental state would be improper). *See supra* ¶83.  Unlike those cases, Kostel's claim for loss of enjoyment of life was not limited solely to physical effects of Kostel's surgery.  She claimed that as a result of those physical effects, she was unable to have "fun" enjoying recreation and family activities.  *See supra* ¶84.  Therefore, like our decision in *Maynard,* Kostel's history of depression and anxiety was admissible on the damage claim.  *See Maynard*, 1997 SD 60, ¶11, 563 NW2d at 834-35.

34.     Some of the proffered evidence was remote in time.  The court also determined that Dr. Schwartz's medical literature did not provide the necessary causative link under *Daubert* and Rule 702 to allow neurosurgeon testimony with respect to suicide and multiple personality disorders.

psychotropic drug prescriptions, and a depressed mood with variable difficulties with concentration, sleep, and appetite.  Another example of admitted evidence included a 1998 hospitalization for progressively worsening depression, classified as "recurrent major depression, severe."  Considering the evidence that was allowed, the overly prejudicial effect of the excluded evidence, the lack of foundation on the excluded evidence, and this Court's deferential standard of review, the trial court did not abuse its discretion in excluding some of Kostel's mental health history.

[¶102.]      WILBUR, Circuit Judge, joins this special writing.